[No. 11975. *En Banc.* January 8, 1915.]

# H. P. EMERY, *Respondent*, v. ANDREW J. LITTLEJOHN et al., *Appellants.*[1]

INSANE PERSONS—DISCHARGE FROM HOSPITAL—TORTS OF INSANE PERSON—LIABILITY OF SUPERINTENDENT. Under Rem. & Bal. Code, § 5967, providing that any patient may be discharged from the state hospital for the insane when, in the judgment of the superintendent, it may be expedient, the superintendent acts in an official capacity in a matter involving his discretion in discharging an inmate, temporarily out on parole; hence he is not liable for damages sustained by a third person by reason of turning the inmate at large, where he did not act maliciously or corruptly.

SAME—DISCHARGE—POWERS OF SUPERINTENDENT—STATUTORY PROVISIONS. The fact that Rem. & Bal. Code, § 5962, provides for the discharge of inmates of the hospital upon application of relatives, etc., by an order of court, after notice to the superintendent and a hearing with provisions for the return of the inmate in case he is not properly cared for or is dangerous, does not negative the superintendent's power to exercise discretion other than in relation to an absolute discharge; since the above section has nothing to do with the superintendent's discharge on his own motion.

SAME—DISCHARGE—ABSOLUTE OR CONDITIONAL. The power of the superintendent of the state insane hospital, given by Rem. & Bal. Code, § 5967, to discharge inmates includes the power to discharge them conditionally or upon parole.

SAME—DISCHARGE FROM HOSPITAL—LIABILITY OF SUPERINTENDENT—NEGLIGENCE. The fact that the superintendent acted negligently in discharging an inmate conditionally, and did not immediately take steps to send a guard for his return, upon hearing that he was giving some trouble (his relatives agreeing to send him East next morning) does not affect the nonliability of the superintendent to answer in damages to one who was injured by an insane attack of the discharged inmate (FULLERTON, J., dissenting).

SAME — CUSTODIAN — DUTIES AND LIABILITIES—TORTS OF INSANE PERSON—EVIDENCE—SUFFICIENCY. The husband of a woman who had obtained the discharge and custody of her insane son from the state insane hospital is not liable in damages to one who sustained injuries in an insane attack by the son, where he had nothing to do with securing the discharge, and it appears from the evidence that the son had been afflicted with a mild form of insanity, and had

[1]Reported in 145 Pac. 423.

never been considered dangerous, and after two weeks in the asylum was released on parole as greatly improved, and upon learning that the son was giving trouble by annoying attentions and letters to a young lady, and upon complaint by police officers, in order to avoid the son's recommitment, he agreed with the officers to send him East to relatives the next morning, and provided him with money therefor, with which he followed the girl, and made an attack upon being prevented from seeing her; since, under all the circumstances, he could not, as a matter of law, be reasonably expected to anticipate the consequences which followed (FULLERTON, CHADWICK, and MAIN, JJ., dissenting).

SAME—QUESTION FOR JURY. In such a case, the liability of the mother is a question for the jury, where it further appears that, in order to get her son released from the hospital, she signed an agreement to assume all responsibility for his actions, knowing that he was not fully recovered, and agreed to care for him, and was told that he was writing letters to a young lady with such frequency as to cause her great anxiety; the question whether she performed her voluntary assumed duty with reasonable care, and should have anticipated that he might become dangerous, being questions of fact for the jury (PARKER, MOUNT, and MORRIS, JJ., dissenting).

Appeal from a judgment of the superior court for Pierce county, Chapman, J., entered October 23, 1913, upon the verdict of a jury rendered in favor of the plaintiff, in an action in tort. Affirmed as to appellant Mrs. Littlejohn and reversed as to the others.

*E. R. York*, for appellants Littlejohn, contended, among other things, that liability for negligence arises only when defendants owe a duty arising from contract or otherwise to the injured party. *Kahl v. Love*, 37 N. J. L. 5; *Western Union Tel. Co. v. Shriver*, 141 Fed. 538, 4 L. R. A. (N. S.) 678; *Akers v. Chicago, St. P. & M. R. Co.*, 58 Minn. 540, 60 N. W. 669; *Baker v. Morris*, 33 Kan. 580, 7 Pac. 267. Under the statute of frauds, defendants would not be liable for the "miscarriage" or "misdoings" of another unless the contract was in writing. 8 Am. & Eng. Ency. Law (1st ed.), 675; 2 Bouvier, Law Dictionary, 240; 2 Abbott, Law Dictionary, 110; *Goldie-Klenert Distributing Co. v. Bothwell*, 67 Wash. 264, 121 Pac. 60, Ann. Cas. 1913 D. 849; *Smith v. Fah*, 54

Ky. (15 B. Mon.) 443; *Richardson v. Crandall,* 48 N. Y. 348. There was no privity of contract. *Parlin v. Brandenburg,* 2 N. D. 473, 52 N. W. 405; *Chung Kee v. Davidson,* 73 Cal. 522, 15 Pac. 100; *State v. St. Louis & S. F. R. Co.,* 125 Mo. 596, 28 S. W. 1074; *Armour & Co. v. Western Construction Co.,* 36 Wash. 529, 78 Pac. 1106; *Puget Sound Brick etc. Co. v. School Dist. No. 73,* 12 Wash. 118, 40 Pac. 608; *Sears v. Williams,* 9 Wash. 428, 37 Pac. 665, 38 Pac. 135, 39 Pac. 280; *National Bank v. Grand Lodge,* 98 U. S. 123; *Anderson v. Fitzgerald,* 21 Fed. 294. The primary liability of Calhoun continued after the parole of Pence. *State v. Peters,* 43 Ohio St. 629, 4 N. E. 81; *German Alliance Ins. Co. v. Home Water Supply Co.,* 174 Fed. 764, 42 L. R. A. (N. S.) 1005; *German Alliance Ins. Co. v. Home Water Supply Co.,* 226 U. S. 220, 42 L. R. A. (N. S.) 1000; *Pennsylvania Steel Co. v. New York City R. Co.,* 198 Fed. 721; *McPhee v. United States Fidelity & Guaranty Co.,* 52 Wash. 154, 100 Pac. 174, 132 Am. St. 958, 21 L. R. A. (N. S.) 535. It was error to refuse the requested instructions that the law presumes that public officers are presumed to have done their duty and that the Littlejohns were entitled to rely upon the parole. *Van Deusen v. Newcomer,* 40 Mich. 90, 136; *Martin v. Mott,* 12 Wheat. (U. S.) 19, 31; *Porter v. Haight,* 45 Cal. 631; *Service v. Shoneman,* 196 Pa. St. 63, 46 Atl. 292, 79 Am. St. 689; 12 Dec. Digest, Malicious Prosecution, §§ 21, 25.

*W. V. Tanner, Stephen V. Carey,* and *J. T. S. Lyle,* for appellant Calhoun.

*Bates, Peer & Peterson,* for respondent. The doctrine of the pardon cases cited by counsel is not at all applicable, as the rule is that when a statute enumerates the things upon which it is to operate, or forbids certain things, it is to be construed as excluding from its effect all those not expressly mentioned, and where it directs the performance of certain things in a particular manner, it forbids by implication

every other manner of performance.    19 Cyc. 23; 36 Cyc.
1122; *Scott v. Ford*, 52 Ore. 288, 97 Pac. 99.   The custom
of paroling patients as practiced by the superintendent being
plainly contrary to the statute could afford no protection,
under the well established rule that a practice on the part of
officers at variance with the plain meaning of the law will
not be sustained as a construction of the law.    12 Cyc. 1057;
*Knox County v. Goggin*, 105 Mo. 182, 16 S. W. 684; *Wal-
ters v. Seuf*, 115 Mo. 524, 22 S. W. 511; *Walters v. Brooks*,
115 Mo. 534, 22 S. W. 514; *Bailey v. Rolfe*, 16 N. H. 247.
Even though a public officer, the responsibility of appellant
Calhoun seems to be thoroughly established by the authori-
ties.    *Merritt v. McNally*, 14 Mont. 228, 36 Pac. 44; *Amy
v. Supervisors*, 11 Wall. 136; *Mock v. Santa Rosa*, 126 Cal.
330, 58 Pac. 826.   The action of Dr. Calhoun in paroling
Pence was beyond his jurisdiction and power, and that he is
liable for all damages flowing therefrom is universally held.
29 Cyc. 1441; *Hover v. Barkhoof*, 44 N. Y. 113; *Bennett
v. Whitney*, 94 N. Y. 302; *Worsham v. Votgsberger* (Tex.
Civ. App.), 129 S. W. 157.

PARKER, J.—The plaintiff seeks recovery of damages from
the defendants for personal injuries which he claims resulted
to him from the negligence of the defendants in failing to
properly restrain and care for one O. W. Pence, an insane
person.   A trial before the court and a jury resulted in ver-
dict and judgment in favor of the plaintiff, from which the
defendants have appealed.

On June 7, 1912, O. W. Pence was adjudged insane by the
superior court for Pierce county, and committed to the West-
ern Washington hospital for the insane.    The appellant Dr.
A. P. Calhoun was then the superintendent of the hospital.
Dr. F. P. Wilt was assistant physician of the hospital, and
directly in charge of Pence while he was in the hospital as
a patient.    Pence was then 30 years old.    He first showed
signs of insanity about ten days previous to his commitment

to the hospital. He never had suicidal or homicidal tendencies. He imagined that people—especially detectives—were after him, to do him injury. Physically, he is in a normal state of health. One of the examining physicians in the insanity proceedings, testifying upon the trial of this case, described Pence's condition as follows:

"Am physician and surgeon. Was one of the physicians appointed to act as a commission to examine O. W. Pence. Recall the examination tolerably well. Remember his condition at that time. Pence to all appearances was normal, in a normal condition; that is, without getting his hobby, he could not have been convicted before any jury of insanity. There was no history of filth, dirt, as to his clothing; in fact, he was careful about his clothing; no suicidal mania; no tendency to injure others and no history at all that would lead to a conviction of insanity. What I convicted him on was delusion and the delusion was of a religious nature. My recollection now is that he was religious altogether and that he had hallucinations I think, hallucinations of hearing, he heard imaginary voices; I think it was on that point alone almost that I found him insane.

"I did not consider him dangerous; if he was given a rest of a few days he would rapidly recover.

"He had delusions that detectives were after him. That people were trying to get at him to do him harm. We sent him to the asylum for rest. If we had a place of detention outside of the asylum, I should not have sent him to the asylum."

Pence is a son of appellant Mrs. Littlejohn, who lives in Tacoma with her husband, A. J. Littlejohn. After Pence was committed to the hospital for the insane, his mother visited him several times. His condition while in the hospital was one of apparent rapid improvement, and, after remaining there a little over two weeks, on June 24, Dr. Wilt, acting for the superintendent of the hospital, permitted Mrs. Littlejohn to take Pence home, though he was not discharged as cured. At that time, she signed the usual writing required of those taking patients from the hospital, reading as follows:

"June 24th, 1912.

"This is to certify that I have taken O. W. Pence on parole from Western Hospital for Insane; knowing that he is not fully recovered, I assume all responsibility for his actions while in my charge, and agree to care for him and return him to the hospital at my own expense if it becomes necessary. I further agree to write the superintendent, informing him of the condition of the patient at intervals designated by him during the life of the parole.

"(Signed) Mrs. A. J. Littlejohn,
"Address 3704 6th Ave., Tacoma, Wash."

Nothing further occurred coming to the notice of Mr. or Mrs. Littlejohn, indicating that Pence's condition was other than one of continuous improvement, until the evening of July 4 or 5, some ten days after he was brought home, when two police officers of the city of Tacoma, Recob and Brown, visited the Littlejohn home and talked to Mr. and Mrs. Littlejohn about Pence. All the information then conveyed to either Mr. or Mrs. Littlejohn relative to the actions of Pence then complained of by the policemen is such as may be gathered from the testimony of Recob, as follows:

"I have lived in the city of Tacoma eight years. Have been a member of the Tacoma Police Department seven years. My attention was called to the conduct of one Pence about the fourth of July, 1912. Mr. Timmins, manager of the Pantages Theatre in Tacoma, called at the police station. He was accompanied by the manager of a play on that week at the theater. They had some letters that had been written to a girl in one of the acts at the theatre. We looked the letters over. They were written by Pence and gave his name and address as Sixth Avenue. We looked up the address and found it was the Littlejohn residence.

"We (Mr. Brown and myself) went to the Pantages Theatre that night. Pence was supposed to be in the front row and we went to observe his actions. He did not come that night, and we went to the Littlejohn house to see him. At that time I did not know that Pence had been an inmate of the asylum. We went to the Littlejohn house to investigate, to see why he was writing such letters. We had talked with the manager and the girl. She was greatly excited.

Mr. Brown went with me. It was about 9:30 in the evening. Brown knocked at the door and Mrs. Littlejohn answered from the window upstairs. Brown said he would like to talk with Pence. She asked 'what about?' Brown said, 'I would like to talk with him.' She came to the door and talked for a minute, and then said she would call Mr. Littlejohn. She went back upstairs and Littlejohn came down. We stood in the reception hall and talked with Mr. Littlejohn. I told him there had been letters received at the Pantages Theatre addressed from his number, and we came out to have a talk with Pence. Littlejohn said: 'Now Pence has just been in from the asylum. I don't like to have you talk with him; it might make him worse.' He would not let us talk with him, and we told him there would have to be something done . . . After Littlejohn refused to let us have a talk with Pence, we told him something would have to be done and he said: 'Well now I have got everything arranged for him to leave tomorrow . . . I will send him east.' . . . I don't remember the place he said, somewhere in the east, to his relatives, or would send him back to the asylum.

"We told him he must not let him go to Portland on account of the girl. She went over there. The girl was awful excited over the letters, and I told Littlejohn to buy a ticket himself and send him east rather than give him money. I said he was liable to go down there (to Portland) and kill someone. He said he was going to send him east. At that time I talked to Littlejohn about the letters and what Pence had been doing. There was no sense to the letters. A right-minded person would not write such letters. He wanted the girl to marry him. Wanted her to meet him over in the Fireman's Park. It was just a lot of foolishness. I had known Mr. Littlejohn by sight for the last eight years. I told Littlejohn if he would do as he said I would leave Pence with him, with the understanding that he would be sent away the next day. I told him to buy the ticket himself and start him east. If he gave him the money he would go to Portland. We didn't insist on seeing Pence that night because we relied on Littlejohn doing as he said. The next I heard of Pence Mr. Timmins told me he had gone to Portland and shot Mr. Emery. This was four or five nights after we were out at Littlejohn's. . . .

"I saw part of the letters written by Pence to the girl, but did not see any letters written by the girl to Pence . . . The letters did not contain any threats or vile language. They were merely the letters of a person having some admiration or pretence of love for the girl, asking her to marry him and expressing affection for her. I had never seen Pence up to that time . . . So far as I know the police department never communicated with the asylum authorities concerning Pence."

Brown's testimony relative to the visit to Littlejohn's home is in harmony with that of Recob above quoted, though it does not go so much into details. Neither Mr. or Mrs. Littlejohn ever saw any of the letters claimed by the policemen to have been written by Pence to the actress, and they had no knowledge of the contents or nature of those letters except as communicated to them by the policemen. No other acts of Pence were complained of or reported to them. On the evening of the visit of the policemen to the Littlejohn home, Pence had been home during the whole evening, and was not at the theater where the policemen went expecting to find him. Mrs. Littlejohn, on the following day, reported by telephone to the hospital, talking to Dr. Wilt, the incident of the policemen coming to their home and complaining of Pence's action in writing the letters. Just what Mrs. Littlejohn told Dr. Wilt of the hospital over the telephone concerning the visit of the policemen is not very clear. Dr. Wilt testified as to what she then told him as follows:

"I talked with Mrs. Littlejohn over the telephone. If I remember right she called me. She mentioned that the police had been to the house the evening before. She did not say why they had been there any more than for the purpose of stopping Mr. Pence's actions. At the time of the conversation Dr. Calhoun happened to be in the office where the telephone is located. I asked him what we should do, and he thought it advisable to send in a guard if he (Pence) was causing any trouble. She (Mrs. Littlejohn) said she would send him east the next morning. That was satisfactory to us. If I remember rightly I told her we would send a

guard.   The reason we did not send a guard for him was
that she promised to send Pence east.   As to imposing con-
ditions as to the manner in which he should be sent east,
I do not know of any special arrangements by which he was
to be sent east.   There was nothing said about that at the
time that I remember.   Dr. Calhoun was in the office at the
time and I talked to him as to what should be done.   This
was not the first time Mrs. Littlejohn had talked to me about
Pence after his release.   As I remember she telephoned to me
several times, and told me how well he was getting along."

A day or two later, on July 7, Pence went away, as Mr.
and Mrs. Littlejohn supposed, to his relatives in Missouri,
as they had planned, and had furnished him money for so
doing.   They evidently honestly believed that he went to
Seattle, with a view of going east over the Great Northern,
and not to the south through Portland.   However, that was
the last seen or heard of him by Mr. or Mrs. Littlejohn un-
til after his shooting respondent in Portland on July 9, re-
sulting in the injuries of which respondent here complains,
and for which he seeks recovery from appellants.   What oc-
curred at the time of that shooting may be related in the
language of respondent's testimony, as follows:

"On the evening of the 9th of July, Tuesday evening I be-
lieve it was, during the latter part of the second performance,
one of the stage hands came to me and reported a gentle-
man in the hall to see one of the lady performers and almost
the same time I think Miss Callie Lowe made the exclamation,
'There is the man that I am afraid of.'   I walked out to the
hall which is on the same level with the stage and the en-
trance from the alley to the stage and standing in the hall
was a man.   I walked right close up to him, possibly a foot
and a half, as I would speak to anybody and I asked who he
wished to see and he said, 'I am O. W. Pence, and I am en-
gaged to be married to Callie Lowe, I would like to speak to
her.'   While he was speaking, I noticed on the lower part of
his vest he had a badge, an officer's badge, deputy sheriff,
and it was turned upside down so I couldn't read it and as he
finished speaking, I reached over and turned over the badge
so I could read the letters.   I says, 'What kind of a badge is

that?' He said, 'What have you got to say about it?' And he pulled his gun out and commenced firing and struck me."

In view of the conclusions we have reached, especially upon the question of the negligence of Littlejohn and wife here complained of, we have related the facts in the most favorable light possible in aid of respondent's contentions, though the facts, as testified to by the policemen are, in some details, contradicted by the testimony of Mr. and Mrs. Littlejohn. Otherwise, the facts as related above are undisputed. Nor does the record contain any other facts, as we view it, lending additional aid to the respondent in the contention made by his counsel.

Counsel for appellant Dr. Calhoun contend that the trial court erred in declining to decide the cause in his favor, as a matter of law, upon their motions for a directed verdict, made at the close of the plaintiff's evidence and also at the close of all of the evidence. The principal ground upon which this contention is rested is, that appellant Dr. Calhoun, being the superintendent in charge of the hospital, performing an official act involving the exercise of his discretion as such, in allowing Pence to leave the hospital with his mother, and in allowing him to remain away, no liability by an action for damages can be imposed upon Dr. Calhoun. We shall, for the purpose of argument, treat all actions of Dr. Wilt, the assistant physician, as those of Dr. Calhoun. The only provision of our statute relating to the discharge or parole of patients by the superintendent of the hospital of his own motion is that found in Rem. & Bal. Code, § 5967 (P. C. 247 § 53), reading as follows:

"Any patient may be discharged from the hospital when, in the judgment of the superintendent, it may be expedient."

This, in fact, is the only provision of our statutes relating to the subject of the discharge or parole of patients by the superintendent, at the instance of any one, except as provid-

ed by Rem. & Bal. Code, § 5962 (P. C. 247 § 43), reading as follows:

"The relatives or friends of an inmate of the hospital for the insane may receive such inmate therefrom on their giving a bond or other satisfactory evidence to the superior judge issuing the commitment, that they, or any of them, are capable and suited to take care of and give proper care to such insane person, and give protection against any of his acts as an insane person. If such satisfactory evidence appear to the judge, he may issue an order, directed to the superintendent of the hospital for the insane, for the removal of such person. If, after such removal, it is brought to the knowledge of the judge, by verified statement, that the person thus removed is not cared for properly, or is dangerous to persons or property by reason of such want of care, he may order such person returned to the hospital."

It is manifest that the discharge of a patient from the hospital by the superintendent of his own motion involves the exercise of discretion upon his part. It is insisted, however, by counsel for respondent, that such discretion of the superintendent pertains only to the question of absolute discharge of a patient, and that he has no other discretionary power, especially none as to the parole or conditional discharge of a patient. It is argued that the provisions of § 5962 above quoted negative the idea of the superintendent's exercising discretion other than in relation to the absolute discharge of a patient. We are unable to agree with this view. It is manifest that the method of relatives or friends acquiring possession of a patient provided for in § 5962 is only a procedure which may be instituted at the instance of such friends or relatives, and has nothing whatever to do with the discretion of the superintendent in discharging patients conditionally or otherwise. Whatever is done under that section may be done even against the judgment or will of the superintendent, and has nothing to do with the performance of any duty upon his part other than to obey the order of court which may be made in pursuance of proceeding under

that section.   The diligence of learned counsel for respondent has not brought to our attention any direct authority throwing any light upon this contention, nor has any such authority come to our notice except the law relating to the pardoning power, which, by way of analogy, furnishes some aid to the solution of this problem.

"The power to pardon is generally held to include the power to mitigate or commute sentences, the theory being that the greater power includes the less."   24 Am. & Eng. Ency. Law (2d ed.), p. 567.

See, also, 29 Cyc. 1570; *Fuller v. State*, 122 Ala. 32, 26 South. 146, 82 Am. St. 17.

We are of the opinion that the power of absolute discharge of patients from the hospital includes the power to parole or conditionally discharge patients therefrom; and that all acts of the superintendent under this power involve the exercise of discretion on his part of a *quasi* judicial character.

The acts of Dr. Calhoun here complained of being official, and calling for the exercise of his discretion, the law seems to be settled beyond controversy that he cannot be called to account for any consequences flowing therefrom, in a civil action for damages instituted by a person claiming to be injured as the result of such discretionary action, in the absence of malicious or corrupt action.   It is not claimed that Dr. Calhoun acted either maliciously or corruptly.   Indeed, it could not be with any show of reason under the evidence. The most that can be said is that he acted mistakenly, or, for argument's sake, we may concede that he acted negligently; but, under all the authorities, such action would not render him liable in this action, since his acts were official and involved his discretion.   In the text of 29 Cyc. 1444, after noticing the law touching the immunity of judicial and legislative officers from liability in an action for damages flowing from their official acts, it is said:

"In the third place are the vast number of officers not holding courts, but discharging executive and administrative

functions, whose discharge involves the exercise of judgment and discretion. Such officers are not liable for a mistaken exercise of such discretion. In many of the cases on the liability of inferior judicial officers and officers discharging quasi-judicial or administrative functions, the opinions would seem to lay stress upon the absence of malice or corrupt intent as an important element in the determination of the immunity from liability. But in most cases what is said in the opinion is merely *dictum*, inasmuch as the actual decision did not recognize the liability. There are, however, a few cases which actually decide that if the act complained of has been done with corrupt motives or malice there is a liability to the person injured. On the other hand, it has been distinctly held that, if the officer whose acts are complained of keeps within his powers, his motives, however corrupt and malicious they may be, may not be made a reason for holding him liable for the damages caused by his acts."

In *Kendall v. Stokes*, 3 How. 87, Chief Justice Taney, speaking for the supreme court of the United States, said:

"A public officer is not liable to an action if he falls into error in a case where the act to be done is not merely a ministerial one, but is one in relation to which it is his duty to exercise judgment and discretion; even although an individual may suffer by his mistake. A contrary principle would, indeed, be pregnant with the greatest mischiefs."

In *Spalding v. Vilas*, 161 U. S. 483, Justice Harlan, speaking for the United States supreme court, in a case where damages were sought in an action against the Postmaster General, claimed to have resulted from his official action, said:

"In exercising the functions of his office, the head of an executive department, keeping within the limits of his authority, should not be under an apprehension that the motives that control his official conduct may, at any time, become the subject of inquiry in a civil suit for damages. It would seriously cripple the proper and effective administration of public affairs as intrusted to the executive branch of the government, if he were subjected to any such restraint. He may have legal authority to act, but he may have such large discretion in the premises that it will not always be

his absolute duty to exercise the authority with which he is
invested.    But if he acts, having authority, his conduct can-
not be made the foundation of a suit against him personally
for damages, even if the circumstances show that he is not
disagreeably impressed by the fact that his action injurious-
ly affects the claims of particular individuals.    In the pres-
ent case, as we have found, the defendant, in issuing the cir-
cular in question, did not exceed his authority, nor pass the
line of his duty, as Postmaster General.    The motive that im-
pelled him to do that of which the plaintiff complains is,
therefore, wholly immaterial.    If we were to hold that the
demurrer admitted, for the purposes of the trial, that the
defendant acted maliciously, that could not change the law."

In *Daniels v. Hathaway,* 65 Vt. 247, 26 Atl. 970, 21 L. R.
A. 377, it is said:

"Discretionary power is, in its nature, independent, and to
make those who wield it liable to be called to account by some
other authority is to take away discretion and destroy inde-
pendence.    Discretion, to a certain extent, implies judicial
functions; and when officers act in such a capacity, they are
not liable to any private person for a neglect to exercise these
powers, nor for the consequences of a lawful exercise of them,
where no corruption or malice can be imputed, and they keep
within the scope of their official duties and authority."

See, also, *Porter v. Haight,* 45 Cal. 631 ; *Fath v. Koeppel,* 72
Wis. 289, 39 N. W. 539, 7 Am. St. 867 ; *Garff v. Smith,* 31
Utah 102, 86 Pac. 772, 120 Am. St. 924 ; *Rohn v. Osmun,*
143 Mich. 68, 106 N. W. 697, 5 L. R. A. (N. S.) 635 ;
*Valentine v. Englewood,* 76 N. J. L. 509, 71 Atl. 344, 19
L. R. A. (N. S.) 262 ; Mechem, Public Officers, § 638 ; Cooley,
Torts (2d ed.), p. 447 ; 23 Am. & Eng. Ency. Law (2d ed.),
p. 375.

We are clearly of the opinion that it must be held, as a
matter of law, that Dr. Calhoun is not liable for the damages
complained of in this case, upon the ground that he acted
in an official capacity in a matter involving his discretion,
and did not act maliciously or corruptly.    Whether he would
have been liable to respondent had he acted maliciously or cor-

ruptly, we do not now decide. Clearly, his acts were not attended by any such motives on his part.

Is there any sound legal basis upon which appellants Littlejohn and wife may be held liable in damages to respondent because of the unfortunate injuries resulting to him from the apparent insane act of Pence? We are constrained to hold, as a matter of law, that there is not. One is not liable for his every act that may ultimately result in wrong to another. He is only responsible for that which, in the light of experience of mankind, he should reasonably anticipate as liable to happen; not that which might barely possibly happen as the result of his act. In the text of Webb's Pollock on Torts (enlarged Am. ed.), on page 42, the learned author observes:

"The doctrine of 'natural and probable consequence' is most clearly illustrated, however, in the law of negligence. For there the substance of the wrong itself is failure to act with due foresight; it has been defined as 'the omission to do something which a reasonable man, guided upon those considerations which ordinarily regulate the conduct of human affairs, would do, or doing something which a prudent and reasonable man would not do.' Now a reasonable man can be guided only by a reasonable estimate of probabilities. If men went about to guard themselves against every risk to themselves or others which might by ingenious conjecture be conceived as possible, human affairs could not be carried on at all. The reasonable man, then, to whose ideal behaviour we are to look as the standard of duty, will neither neglect what he can forecast as probable, nor waste his anxiety on events that are barely possible. He will order his precaution by the measure of what appears likely in the known course of things. This being the standard, it follows that if in a particular case (not being within certain special and more stringent rules) the harm complained of is not such as a reasonable man in the defendant's place should have foreseen as likely to happen, there is no wrong and no liability."

Similar observations are made in the text of Negligence of Imposed Duties (Personal), p. 133, by the learned author, Justice Ray, as follows:

"Mischief which could by no reasonable possibility have been foreseen, and which no reasonable person would have anticipated, cannot be taken into account as a basis upon which to predicate a wrong. A reasonable man does not consult his imagination, but can be guided only by a reasonable estimate of probabilities. The reasonable man, then, to whose ideal behaviour we are to look as the standard of duty, will neither neglect what his reason and experience will enable him to forecast as probable, nor conduct, on a basis of bare chances, a business whose success is dependent upon his accuracy in forecasting the future. He will order his precaution by the measure of what appears likely in the usual course of things.

"The proper inquiry is not whether the accident might have been avoided if the one charged with negligence had anticipated its occurrence, but whether, taking the circumstances as they then existed, he was negligent in failing to anticipate and provide against the occurrence. The duty imposed does not require the use of every possible precaution to avoid injury to individuals, nor of any particular means which it may appear, after the accident, would have avoided it. The requirement is only to use such reasonable precautions to prevent accidents as would have been adopted by prudent persons prior to the accident."

This doctrine has been applied by us in *White v. Spokane & Inland Empire R. Co.*, 54 Wash. 670, 103 Pac. 1119; *Nordstrom v. Spokane & Inland Empire R. Co.*, 55 Wash. 521, 104 Pac. 809, 25 L. R. A. (N. S.) 364, and other master and servant personal injury cases where there was involved a duty of the master to the servant resting upon the contract of service existing between them. In so far as the master's liability for injury to the servant is concerned, a duty, to whatever extent it exists, is owing directly to the servant. The duty here involved, if any, was that of Littlejohn and wife to respondent simply as a member of the public. Assuming, however, that that duty was of such a nature that Littlejohn and wife might become liable to some person injured by Pence, in view of the control they had over him, we are quite unable to see that Pence's homicidal act resulting in the injury to respondent was within the realm of proba-

bility, as Littlejohn and wife had a right to view his probable future actions in the light of the knowledge they possessed as to his mental condition. The above quoted observations from the works of Pollock and Ray are, of course, very general, but we cannot escape the conclusion that they nevertheless fully answer the problem here involved, as a matter of law, in favor of Littlejohn and wife. The facts they had before them pointing to the probable future actions of Pence were, that he had no homicidal tendencies; that he had developed no signs of insanity until about two weeks before he was committed to the asylum, and about four weeks before he committed this act; that his insanity was of a mild form; that he was improving mentally up until the time they were informed of his infatuation with the actress; that he was regarded by the assistant physician of the hospital, Dr. Wilt, as being harmless; that the letters written by him to the actress, as the contents of those letters were made known by the policemen to Littlejohn and wife, "did not contain any threats or vile language," but "were merely the letters of a person having some admiration or pretense of love for the girl, asking her to marry him, and expressing his affection for her." It seems clear to us this would not indicate to the ordinary mind anything more than that Pence was making himself somewhat of a nuisance to the actress, and might possibly continue to do so. It does not contain the suggestion that he might attempt to do any one physical harm, in view of the fact that he had never developed any tendencies to do any one physical harm up to the time of shooting respondent. It is true, one of the policemen says in his testimony that he told Littlejohn that Pence was liable to go to Portland "and kill some one," but this was only an opinion expressed on the part of the policeman, and not warranted by the facts then communicated by him to Littlejohn except as an opinion of a bare possibility. What Littlejohn and wife then learned as to what Pence was actually doing was the thing to guide them in their actions. We are of the opinion that it must be

decided, as a matter of law, from the undisputed facts here shown, that Littlejohn and wife were, as reasonable persons, not bound to anticipate the unfortunate occurrence upon which it is now sought to render them liable in damages. The diligence of learned counsel for respondent has not brought to light a single decision of any court holding a person liable for negligence growing out of his want of care and restraint over an insane person. A remark made by the United States court of appeals of the eighth circuit, in their syllabus to *Western Union Tel. Co. v. Schriver*, 141 Fed. 539, seems quite appropriate here, where they say:

"The absence of reported judgments and decisions sustaining an alleged liability under a given state of facts raises a strong presumption that no such liability exists."

We are not prepared to say that a private person having the legal custody and control of a violently insane person with homicidal tendencies could not, under any circumstances, be rendered liable for damages caused by such a person, resulting from want of proper restraint on the part of the person having him so in charge, yet no decision of a court involving even such an extreme case has been brought to our notice. We conclude that the judgment of the learned trial court should be reversed, and the cause dismissed upon the ground that there is no legal liability to answer to respondent in damages, resting upon either Dr. Calhoun or the Littlejohns.

Mount and Morris, JJ., concur.

Gose, J. (concurring in part)—I concur in the view that neither Dr. Calhoun nor Andrew J. Littlejohn is liable in damages to respondent. I think the statute clothed Dr. Calhoun with discretionary powers. The appellant husband was not instrumental in getting Pence out of the hospital. He had no knowledge of his removal from the hospital until he found him in his home. I think the case stands upon a different footing as to Mrs. Littlejohn. In order to get Pence released from the hospital, she signed an agreement to

"assume all responsibility for his actions" while in her charge, "knowing that he is not fully recovered." She agreed "to care for him." She knew that Pence had been adjudged insane a short time before she secured his release. She was told that he was writing letters to a young lady with such frequency as to cause her great anxiety. She was dealing with an insane man who had only partially recovered his reason. I think, upon the facts stated, it was for the jury to determine whether, in the exercise of reasonable care, she should have anticipated that Pence might become dangerous at any moment. She had voluntarily assumed a duty. Did she exercise reasonable care in performing that duty? The jury and the trial court have said no. I do not think that we should hold that the verdict is without sufficient evidentiary basis. To this extent I dissent.

CROW, C. J., and ELLIS, J., concur with GOSE, J.

CHADWICK and MAIN, JJ. (concurring in part)—We think that Mr. and Mrs. Littlejohn are liable to answer in damages. We agree that Dr. Calhoun is not liable.

FULLERTON, J. (dissenting)—I am unable to concur in the conclusion reached by the majority. In my opinion, the evidence justified submitting the question of liability as against all of the defendants. As to the superintendent of the asylum, it may be that he acted within his authority when he granted the parole to Pence in the first instance. But I think he was grossly negligent in not immediately ordering Pence to be brought back to his place of confinement when he learned that he had become infatuated with the young woman, and had pursued his attentions towards her with such vehemence as to put the woman in fear, and to cause those surrounding her to believe that it was a proper matter to be brought to the notice of the police. It is common knowledge that, when a man of weak or unsound mind conceives an infatuation for a woman, he commonly at once becomes, particularly if his attentions are shunned and avoided,

highly dangerous, not only to the object of his infatuation, but to those whom he believes stand in the way of his approach to her. Dr. Calhoun must be held to have known of this general propensity. He was the person selected by the state to control the custody and actions of Pence, and the person on whom the state looked to see that he did not become a menace to the public. When, therefore, he was informed of this new form of dementia in his patient, and failed to take adequate action to prevent harm therefrom, it was, in my opinion, for the jury to say whether he performed his duty with that degree of care and prudence the circumstances imposed upon him. I concede that he has a large measure of discretion in the care and control of the unfortunate committed to his care, but this does not absolve him from all prudence. Carried to its utmost limit, the doctrine of the majority would justify him in turning the entire inmacy of the asylum loose upon the unsuspecting public. But it is said there are no precedents for such a liability. I think there are analogous cases. The parents of a child are not, at common law, usually liable for the torts of their minor children, but they are so if they know of their propensity for mischief, and do not use a reasonable degree of prudence to restrain them. The keeper of a vicious animal is not commonly liable for injuries caused by it, but is so if he knows of its vicious nature and neglects to use reasonable care to prevent its doing mischief. A poor unfortunate with mind destroyed is less responsible than even these, and I cannot conceive of any principle of law which would hold the keeper of one responsible and exempt the keeper of the other. Again, it is said that the rule I conceive should prevail would tend to the injury of the person confined, as the keeper of the asylum would hesitate to discharge a person committed to his charge even after he felt that a cure had been effected, because of his liability to answer in case of a mistake. But it is a sufficient answer to this to say that

our statute provides for a judicial inquiry in cases of doubt, and immunity from liability for a wrongful discharge of a patient can be had by pursuing that method.

As to Andrew J. Littlejohn, I think him liable on the principle that it was negligence on his part to turn Pence loose with means in his pocket to pursue the girl to a neighboring city, particularly after warning had been given him of the young man's infatuation and of his liability to pursue such a course. Common prudence requires that persons of unsound and defective minds be guarded. The most optimistic must recognize this fact if they do no more than but glance at the great public institutions the state supports and maintains for their control. Ordinary prudence, it seems to me, would have dictated that Mr. Littlejohn, since he had assumed to assist in protecting the public from this unfortunate person, should have placed him in the charge of some person to look out for him on his journey to his intended destination, or, at least, should have himself purchased his ticket and seen that he was safely on his way before leaving him free to exercise the bent of his disordered mind.

Mrs. Littlejohn, in my opinion, is the least blamable of any of the appellants. Pence was her son. For him she had the instinctive, primal love; the love that causes a mother to make sacrifices for her offspring when its return is ingratitude, contumely, and hate; the love that survives and gives rise to hope when all the world condemns. But I think it was for the jury to say whether even she, in this instance, exercised that degree of care which was incumbent upon a mother. She could but know that her son was irresponsible, that his dementia had taken a dangerous turn, and that he was liable because thereof, if left unrestrained, to inflict injury on some individual unaware of his infirmity.

I conclude, therefore, that the question of the defendants' negligence was for the jury, and that, since they found negligence, the judgment should be affirmed.