## Norma A. Fisher, Appellee v. Grant Mutimer, Appellant.

### Gen. No. 9,138.

Opinion filed September 28, 1937.   Rehearing denied January 23, 1938.

Louis A. Shultz, Jr., and James T. Reid, both of Rockford, and William L. Pierce, for appellant.

Karl C. Williams, of Rockford, for appellee; J. Phillip Dunn, of Rockford, of counsel.

Mr. Justice Dove delivered the opinion of the court.

The complaint in this case alleged that on January 25, 1935 and for more than one year prior thereto, Robert Mutimer, now deceased, was living in Winnebago county at the home of his father Grant Mutimer, the defendant herein. That during that period of time he, the said Robert Mutimer, exhibited threatening tendencies and committed personal violence toward his father by striking him. That such actions caused his parents to believe that he was mentally unsound and at their request, he, the said Robert, was examined by a psychiatrist. That on January 25, 1935 Robert was, upon the petition of the defendant, adjudged insane and committed to the East Moline State Hospital. That he entered the hospital on January 28, 1935 and remained confined therein until March 11, 1935 when, at the request of the defendant, he was paroled for a period of 90 days, the defendant agreeing in writing to carefully care for him both day and night and to make written reports to the managing officer of said hospital every two weeks and to return him to the hospital in the event the defendant was unable to carry out such written agreement. It was further alleged that the defendant further agreed to exonerate the management in the event his son should commit any act of violence while away from the institution. The complaint then averred that on June 5, 1935, at the request of the defendant, Robert was ordered recommitted to the hospital, that thereafter and while Robert was incarcerated in the county jail, the defendant requested that said order of recommit-

ment be vacated. That the county judge did not vacate said order of recommitment but did release Robert from jail and thereafter on June 7, 1935, at the request of the defendant, Robert's parole to his father was extended upon the same conditions for a further period of 90 days. It was further alleged that during the month of July, 1935, Robert obtained a revolver and engaged in target practice upon defendant's premises with the knowledge and consent of the defendant. The complaint then alleged that the defendant, knowing the aforesaid facts and circumstances, was under a duty to plaintiff's intestate to exercise ordinary care and caution in caring for Robert, that he did not do so, but negligently permitted Robert to be at large with a revolver and to have and to use the same and negligently procured his release on parole following his recommitment to the hospital. It was then alleged that as a result of said negligence, Robert, on July 23, 1935, went to the home of the plaintiff and then and there shot and killed plaintiff's intestate.

By his answer, the defendant admitted that Robert, on January 25, 1934, was living at the defendant's home, denied that for a year prior thereto he had exhibited violent tendencies and denied that he had committed acts of personal violence toward the defendant, except the defendant admitted that at one time Robert did strike the defendant in the ribs. The answer admitted the examination of Robert by a psychiatrist and the filing of the petition for the commitment of Robert to the East Moline State Hospital and his commitment to that institution on January 25, 1935, but denied or called for strict proof of substantially all the other matters alleged in the complaint. The cause was submitted to a jury, resulting in a verdict for the plaintiff for $4,500, upon which judgment was rendered and the defendant brings the record to this court for review.

The evidence discloses that prior to December 27, 1934, appellant lived with his wife and adult son, Robert, on Prairie Road, southwest of Rockford, and was engaged in truck farming. On that day another son, Delbert, took Robert to Dr. Egbert W. Fell, a psychiatrist, for examination. Dr. Fell testified that he found him to be irritable but of average intelligence and diagnosed his case as dementia precox, a common mental disease, curable in a few cases. Thereafter and on January 25, 1935, appellant filed a petition in the usual form in the county court, alleging that his son was insane or suffering from mental derangement and as a result thereof Dr. Fell and Dr. Bissekumer were appointed commissioners and he was regularly adjudged insane and committed to the East Moline State Hospital. Within two or three weeks appellant visited the hospital and gave to an attendant there a history of Robert's case. On March 5, 1935, Dr. J. A. Campbell, the managing officer of the hospital, wrote appellant advising him that they had studied his son's case very carefully and had come to the conclusion that his mental condition did not warrant institutionalization at that time. Dr. Campbell's letter continues: "He (Robert) has many chances for improvement under favorable home conditions. We, therefore, suggest that he should be taken home. We would appreciate it very much if you would come to the institution and discuss this matter with us in detail."

Appellant, upon the receipt of this letter, went to the hospital, discussed the case with Dr. Campbell and Dr. Gamberg, who had immediate charge of Robert's case and they both were witnesses upon the trial of this case. Dr. Gamberg testified that he specializes in psychiatry and neurology. That he examined Robert shortly after he entered the institution and found him in excellent health but suffering from a disorder of

behavior characterized by stubbornness and selfishness and having his own way. He found that Robert had a grudge against his family because his brother apparently had received more advantages than he had. This witness further testified: "Robert behaved himself perfectly well under my observation. He had no delusions or hallucinations. He never had any arguments or fights while in the hospital. He didn't show any particularly bad signs or symptoms of insanity. I thought the boy a proper person for parole. He was never violent while I saw him. Patients are sometimes paroled to be given a chance to adjust themselves socially when the patient is not vicious or violent. We classed the boy under primary behavior disorder, simple adult maladjustment. This is not a form of insanity. The boy was not insane. It was proper to parole this boy to his father and that he so told his father and advised him to give the boy a chance to make good and not to cross him or argue with him but to bring the boy back if he was impossible to control." Upon cross-examination he stated that Robert had had a fight with another patient while at the institution.

Following this conversation and on March 11, 1935, appellant executed a request to the managing officer of the hospital that his son be paroled. This request contained the following: "I agree to carefully care for the patient, or have some other responsible person do so, both day and night, and to exonerate the management of the state hospital should he commit any act of violence while away from the institution. I also agree to return the patient to the hospital should I not be able to fill my agreement and I further agree to report in writing to the managing officer of the hospital every two weeks for ninety days." The evidence is further that in lieu of these written reports, it was the

practice of the hospital to substitute personal monthly contacts with a parole officer or other representative of the institution.

Upon Robert's release from the hospital on parole, he returned to his home and the evidence is, that with the exception of one occasion hereafter referred to, his conduct was good, that he was not vicious or violent but obedient, attended church and Sunday school, went out with young people, worked every day with his father upon the truck farm and had a vegetable route which he covered about three times a week. On one occasion about June 5, 1935, he and his father had a disagreement about the use of the family car and Robert told his father that if he didn't give him the key to the car, he (Robert) would take it away from him. The father testified that he thereupon gave the key to the car to his son and to justify his conduct testified that Dr. Gamberg had cautioned him not to cross Robert or argue with him. The evidence is further that Robert was physically strong and healthy, that he weighed in excess of 200 pounds, was six feet tall and at this time was 22 years of age. Following the argument about the car, Robert was placed in jail at his father's request, but on June 7, 1935 appellant executed a request that the parole be extended for 90 days and this was done, and Robert returned to appellant's home. During the latter part of this month or in the early part of July, Robert secured a .22 caliber revolver without the knowledge or consent of his father and made a target near the garden on his parents' farm. According to the testimony of appellant and his wife, they heard him firing the revolver, inquired of him where he got it and he said he rented it for three weeks for a dollar and they told him to return it and he said he would, that on the day following his parents asked him if he had returned the revolver as he had promised, that he assured them he had, that they searched his room but did not find the revolver and

concluded he had returned it and they never saw the revolver again. There is evidence of others who testified that they had heard shooting on appellant's farm on various occasions and the target was found on July 23, 1935 and disclosed numerous shot holes.

The evidence is further that Guenivere Fisher lived at home with her parents and brother more than five miles from the home of appellant. That she was 20 years of age and prior to July 23, 1935 had been in Robert's company several times and that upon a few occasions Robert had called upon her at her home. On the morning of July 23, 1935, Robert left his home alone and drove his father's automobile to Guenivere's home, arriving there about 8:30 o'clock. He entered the home and was met by Norman, Guenivere's brother. He inquired for Guenivere, who came. Norman left the room and shortly thereafter he heard some shots and when he returned to the room he found his sister had been shot and a revolver was in Robert's hand. Without leaving the room Robert shot himself and both he and Guenivere died the same day.

The liability of appellant is predicated upon his alleged negligence as custodian of his paroled insane son. The specific charge is that appellant was negligent in procuring Robert's release following his recommitment to the hospital and was negligent in permitting Robert to have and use a revolver and was negligent in permitting him to be at large with a revolver. In support of appellee's contention that one, to whom an insane person has been paroled, is liable for the torts of such insane person in the event the custodian is negligent in the care and custody of such insane person, counsel for appellee cite and rely chiefly upon *Emery v. Littlejohn,* 83 Wash. 334, 145 Pac. 423. Counsel for appellant insist that the facts in that case are clearly distinguishable from the facts in the instant case, contend that the trial court erred in refusing appellant's peremptory instructions tendered at the close

of the evidence offered on behalf of appellee and renewed at the close of all the evidence and call our attention to *Ballinger v. Rader,* 153 N. C. 488, 69 S. E. 497; *Whitesides v. Wheeler,* 158 Ky. 121, 164 S. W. 335, 50 L. R. A. (N. S.) 1104; *Theroux v. Carrier,* 21 Quebec Official Law Rep. 156 and *Prudential Society v. Ray,* 202 N. Y. S. 614 affirmed without opinion in 239 N. Y. 600.

*Emery v. Littlejohn, supra,* was an action brought to recover damages for personal injuries resulting from the alleged negligence of the defendants to properly restrain and care for an insane person. It appeared in that case that in June, 1912, O. W. Pence was adjudged insane and committed to the Western Washington State Hospital for the insane. Pence was then 30 years old and lived with his stepfather and mother at their home in Tacoma. He first showed signs of insanity about ten days previous to his commitment and while he never had suicidal or homicidal tendencies, he imagined that detectives were after him to do him injury. On June 24, 1912 he was paroled to his mother, she executing at that time the following instrument: "This is to certify that I have taken O. W. Pence on parole from Western Hospital for insane; knowing that he is not fully recovered, I assume all responsibility for his actions while in my charge, and agree to care for him and return him to the hospital at my own expense if it becomes necessary. I further agree to write the superintendent, informing him of the condition of the patient at intervals designated by him during the life of the parole." Pence returned to the home of his parents and about ten days later some police officers came to the home and asked to see Pence, informing his parents that there had been some letters received by an actress at a local theater which purported to be signed by Pence and they wanted to talk

with him. The police officers were advised that Pence had just returned from the asylum and that the parents preferred not to have him talk to the police officers and informed them that their son was going to leave on the next day to visit relatives in the east. Mrs. Littlejohn, on the following day, reported by telephone to the hospital the incident of the policemen coming to their home and complaining of Pence's action in writing the letters. On July 7th, Pence left the home of his parents for the purpose, so his parents supposed, of visiting his relatives in Missouri, and they furnished him money with which to go, but instead of going to visit his relatives, he went to Portland and on the evening of that day went to the theater to see the same actress to whom he had written the letters at Tacoma. The actress had told the theater manager she did not want to see him, so when Pence called and asked to speak to her, the plaintiff, the manager of the theater, noticed on the lower part of his vest that he wore an officer's badge, which was turned upside down and Emery, the plaintiff, asked him what kind of a badge it was and Pence queried, "What have you got to say about it?" and forthwith produced his revolver and shot the plaintiff. To recover for the injuries which he sustained, plaintiff instituted suit against Mr. and Mrs. Littlejohn, (Pence's stepfather and mother) and Dr. Calhoun, the superintendent of the hospital. There was a judgment against all of the defendants in the trial court. Upon appeal five of the justices held that the judgment against Mrs. Littlejohn should be sustained. Six of the justices held that Mr. Littlejohn was not liable. Eight of the justices held Dr. Calhoun, the superintendent of the asylum, not liable. Three of the justices held that there was no liability on the part of any of the defendants, while one of the justices was of the opinion that all were liable. In affirming the judg-

ment as to Mrs. Littlejohn, the court said: "In order to get Pence released from the hospital, she signed an agreement to assume all responsibility for his actions while in her charge, 'knowing that he is not fully recovered.' She agreed 'to care for him.' She knew that Pence had been adjudged insane a short time before she secured his release. She was told that he was writing letters to a young lady with such frequency as to cause her great anxiety. She was dealing with an insane man who had only partially recovered his reason. I think upon the facts stated, it was for the jury to determine whether, in the exercise of reasonable care, she should have anticipated that Pence might become dangerous at any moment. She had voluntarily assumed a duty. Did she exercise reasonable care, in performing that duty? The jury and trial court have said no. I do not think we should hold that the verdict is without sufficient evidentiary basis."

After holding Dr. Calhoun, the superintendent of the asylum not liable, the opinion of Judge Parker quotes from the text of Webb's Pollock on Torts as follows: "The doctrine of 'natural and probable consequence' is most clearly illustrated, however, in the law of negligence. For there the substance of the wrong itself is failure to act with due foresight; it has been defined as 'the omission to do something which a reasonable man, guided upon those considerations which ordinarily regulate the conduct of human affairs, would do, or doing something which a prudent and reasonable man would not do.' Now a reasonable man can be guided only by a reasonable estimate of probabilities. If men went about to guard themselves against every risk to themselves or others which might by ingenious conjecture be conceived as possible, human affairs could not be carried on at all. The reasonable man, then, to whose ideal behavior we are to look as the standard of duty, will neither neglect what he can forecast as probable, nor waste his anxiety on events

that are barely possible. He will order his precaution by the measure of what appears likely in the known course of things. This being the standard, it follows that if in a particular case (not being within certain special and more stringent rules) the harm complained of is not such as a reasonable man in the defendant's place should have foreseen as likely to happen, there is no wrong and no liability.'' Judge Parker then quotes from Ray's Negligence of Imposed Duties where the author states: ''The proper inquiry is not whether the accident might have been avoided, if the one charged with negligence had anticipated its occurrence, but whether, taking the circumstances as they then existed, he was negligent in failing to anticipate and provide against the occurrence. The duty imposed does not require the use of every possible precaution to avoid injury to individuals, nor of any particular means which it may appear, after the accident, would have avoided it. The requirement is only to use such reasonable precautions to prevent accidents as would have been adopted by prudent persons prior to the accident.'' Judge Parker's opinion then continues; ''The duty here involved, if any, was that of Littlejohn and wife to respondent simply as a member of the public. Assuming, however, that that duty was of such a nature that Littlejohn and wife might become liable to some person injured by Pence, in view of the control they had over him, we are quite unable to see that Pence's homicidal act resulting in the injury to respondent was within the realm of probability, as Littlejohn and wife had a right to view his probable future actions in the light of the knowledge they possessed as to his mental condition. The above quoted observations from the works of Pollock and Ray are, of course, very general, but we cannot escape the conclusion that they nevertheless fully answer the problem here involved, as a matter of law, in favor of Littlejohn and wife. The facts they had before them pointing to the prob-

able future actions of Pence were, that he had no homicidal tendencies; that he had developed no signs of insanity until about two weeks before he was committed to the asylum, and about four weeks before he committed this act; that his insanity was of a mild form; that he was improving mentally up until the time they were informed of his infatuation with the actress; that he was regarded by the assistant physician of the hospital, Dr. Wilt, as being harmless; that the letters written by him to the actress, as the contents of those letters were made known by the policemen to Littlejohn and wife, 'did not contain any threats or vile language,' but 'were merely the letters of a person having some admiration or pretense of love for the girl, asking her to marry him, and expressing his affection for her.' It seems clear to us this would not indicate to the ordinary mind anything more than that Pence was making himself somewhat of a nuisance to the actress, and might possibly continue to do so. It does not contain the suggestion that he might attempt to do any one physical harm, in view of the fact that he had never developed any tendencies to do any one physical harm up to the time of shooting respondent. It is true, one of the policemen says in his testimony that he told Littlejohn that Pence was liable to go to Portland 'and kill some one,' but this was only an opinion expressed on the part of the policeman, and not warranted by the facts then communicated by him to Littlejohn except as an opinion of a bare possibility. What Littlejohn and wife then learned as to what Pence was actually doing was the thing to guide them in their actions. We are of the opinion that it must be decided, as a matter of law, from the undisputed facts here shown, that Littlejohn and wife were, as reasonable persons, not bound to anticipate the unfortunate occurrence upon which it is now sought to render them

liable in damages. The diligence of learned counsel for respondent has not brought to light a single decision of any court holding a person liable for negligence growing out of his want of care and restraint over an insane person. A remark made by the United States court of appeals of the eighth circuit, in their syllabus to *Western Union Tel. Co. v. Schriver,* 141 Fed. 539, seems quite appropriate here, where they say: 'The absence of reported judgments and decisions sustaining an alleged liability under a given state of facts raises a strong presumption that no such liability exists.' We are not prepared to say that a private person having the legal custody and control of a violently insane person with homicidal tendencies could not, under any circumstances, be rendered liable for damages caused by such a person, resulting from want of proper restraint on the part of the person having him so in charge, yet no decision of a court involving even such an extreme case has been brought to our notice. We conclude that the judgment of the learned trial court should be reversed, and the cause dismissed upon the ground that there is no legal liability to answer to respondent in damages, resting upon either Dr. Calhoun or the Littlejohns.''

*Ballinger v. Rader,* 153 N. C. 488, 69 S. E. 497, was an action against the parents of an insane person who committed a homicide. In affirming a judgment rendered upon an instructed verdict for the defendants the court said: "The evidence fails to show that the defendants were in any way responsible for the unfortunate killing of plaintiff's daughter by their insane son, Lonnie W. Rader. The son had been regularly discharged by the authorities of the hospital, upon whom the law imposed the duty of determining whether or not a patient was safe to be at large. These defendants had the right to rely upon the judgment of the

hospital authorities, unless there had been a subsequent change in their son's condition, which is not shown. The homicide was not the natural and logical consequence of Lonnie W. Rader being at large. As was said in this case, 151 N. C. 386, (wherein this court held the directors and superintendent of the hospital not liable) 'the discharge of Rader, his absence from the hospital, his presence in Catawba County, and at the church on the day of the homicide was a mere condition which accompanied, but did not cause the injury.' The evidence does not show that the defendants could have reasonably anticipated the act of Lonnie, who was at church that day, in ordinary course, and who had been invited to be there by the plaintiff. Upon a review of the evidence we are of opinion that his Honor did not err in holding that it was not sufficient to be submitted to the jury in the support of an allegation that the homicide was caused by the negligence of the defendants. Lonnie W. Rader was 24 years of age. Still there might have been circumstances which would have tended to show such gross negligence on the part of those in charge of him, as would have made them liable for a result which they might have reasonably anticipated. But such is not the case here.''

*Whitesides v. Wheeler,* 158 Ky. 121, 164 S. W. 335, 50 L. R. A. (N. S.) 1104, was a suit brought to recover damages for injuries sustained by the plaintiff when he was shot and wounded by Gilly Wheeler, the insane son of the defendant, then about 32 years of age. The complaint alleged that the defendant knew her son was dangerous, that he kept deadly weapons about him and that she knew or could have known that injury to others might result therefrom. The evidence disclosed that when Gilly was about 19 years of age he was adjudged insane following a controversy in which he cut his adversary with a pocket knife. That he was confined

in the Lakeland Asylum for about a year, when he was released as having recovered. That upon his release he returned to his mother's home and was living there when he shot the plaintiff, who was a painter engaged by the defendant to paint her home. The trial court directed a verdict for the defendant and in affirming that action the court said there was no proof in the record that she knew her son had a weapon or that she knowingly permitted it to remain in a place accessible to him. The court then stated that if the defendant knew that her son had this weapon and if his condition of mind was such that she knew, or in the exercise of ordinary care, could have known that injury to others might result therefrom, then she was guilty of negligence and answerable in damages or if she knowingly permitted the weapon to remain in a place accessible to him, and knew or, in the exercise of ordinary care could have known that danger to others might result therefrom, she was guilty of actionable negligence.

*Theroux v. Carrier, supra,* holds that a father of an insane adult son, who lives with him, and whose mental condition is not such as to cause any apprehension as to his probable acts, or such as to make it seem necessary to restrain him, is not responsible for the torts of the son committed without any fault or negligence on the part of the father.

*Prudential Society v. Ray, supra,* was a suit instituted by a loan company against the husband of an insane wife to recover from him the amount it had loaned the wife upon a ring which she had pawned to the plaintiff. The wife had been adjudged insane and paroled to her husband. The court held the defendant not liable and stated that the evidence disclosed nothing in her condition just prior to her transactions with the plaintiff to have led the defendant to anticipate that she was going to pawn her ring and that the husband

could not have foreseen or anticipated what she was going to do. The court cited with approval *Ballinger v. Rader, supra,* and held that the husband was justified in relying upon the judgment of the physician in regard to the manner in which his wife was to be treated.

In the instant case it appears that prior to Robert's release from the hospital, the superintendent thereof informed appellant that they had carefully studied Robert's case and that his mental condition did not warrant his confinement and suggested that he be taken home. Appellant, in our opinion, did what any normal, interested, reasonable father would have done under the same circumstances. He immediately went to the hospital to see about his son and was told by Dr. Gamberg, who had immediate charge of Robert's case and who was an expert in mental diseases, that Robert was not insane, that he was not vicious or violent, that it was proper to release him on parole and that he should be given a chance in appellant's home to socially adjust himself and should be permitted to associate with young people, go along in his usual way and that appellant should not cross or argue with him. Appellant, of course, relied upon the opinions and judgments of Dr. Campbell and Dr. Gamberg and was justified in so doing. After Robert was released from the institution, he returned to his father's home and led an apparently normal life until about June 5, 1935 when his father forbade him the use of the automobile and Robert then threatened to take the keys of the automobile from his father unless they were given to him. Following the directions of the officers of the hospital, appellant did not cross or argue with his son, but gave them to him. He immediately had Robert taken into custody and placed in jail. The same day Judge Williams, the county judge, had a talk with Robert and as a result of that talk, Judge Williams called appellant over the phone and requested him to

come to his office the following morning. Appellant did so and Judge Williams testified that he then told appellant of his conversation with Robert and stated to appellant that he didn't think it right to send Robert back to the institution and that Robert had told him (Judge Williams) that he would obey his father and Judge Williams suggested that he be given another chance. Appellant testified that he then said to Judge Williams: "If you think that is the thing to do, I'm willing to try it again." The testimony of appellant is corroborated by Judge Williams and immediately following this conversation Robert was released from jail and went home with his father. Appellant concealed nothing from the county judge, made no representations to him of any kind or character and did nothing to induce the county judge to release him, but only consented to the suggestion made by Judge Williams and took his son home again. Certainly no liability can be predicated upon appellant's conduct in connection with his son's release from the county jail.

The other specific charges against appellant are that he was negligent in permitting Robert to have and to use a revolver and in allowing him to be at large with a revolver. The evidence is that the only time appellant ever saw Robert have a revolver was in the early part of July, 1935. That he heard shots in the yard, went out and found Robert shooting at a target. That he asked Robert where he got the revolver and Robert stated he had rented it for three weeks for one dollar. Appellant told him to take it back and Robert said he would. The next day appellant asked him if he had and Robert replied in the affirmative. Appellant further testified that he never saw the revolver again and that the revolver Robert used in taking the life of appellee's intestate and in killing himself was not the revolver Robert had used at target practice.

The evidence is further that appellant and his wife searched Robert's room on the morning following the time he used the revolver at target practice and no gun was found. There is some evidence in the record that revolver shots were heard coming from appellant's place at various times prior to the time of the death of appellee's intestate and the evidence also discloses that a target was found in the yard after Guenivere's death with a number of shot holes therein, but we are clearly of the opinion that from all the evidence and all the facts and circumstances in evidence, the charges that appellant permitted Robert to have and to use a revolver and allowed him to be at large with a revolver are not sustained by a preponderance of the evidence.

Counsel for appellee argue that because appellant did not disclose to the hospital authorities that Robert's paternal grandfather was insane and did not report to the parole officer that he, appellant, had had trouble with Robert about the use of the family car and did not advise the parole officer that Robert shot a revolver at a target in the yard of appellant, that it necessarily follows that appellant was negligent and failed to exercise such ordinary care as was required of him as Robert's custodian. We do not think so. It is not charged that appellant was guilty of any misrepresentation in procuring Robert's release on parole or in having it extended. Neither the superintendent of the institution nor any psychiatrist connected with it ever asked appellant anything about the family history of Robert or of his parents or grandparents. Miss Russell testified that she was the chief psychiatric social worker at the East Moline Hospital and that in taking a history of Robert's case on February 16, 1935 appellant stated to her that there was no previous history of mental insanity in the family. Appellant testified he was not inquired of concerning this matter. It does

appear that when the parole was extended on June 7, 1935 appellant met Miss Russell at Freeport, as instructed by Dr. Gamberg when Robert was first paroled and she there asked him if he wanted to consider applying for a discharge for Robert or for a further parole and that appellant suggested an extension of the parole. Miss Russell further testified that Robert was present and on this occasion she observed him and he seemed to her to be somewhat improved but not entirely recovered. It was at this time that appellant inquired of Miss Russell: 'What do you think of Robert, you are an expert and I am not?'' and Miss Russell replied: ''Well, I think the best thing we can do is to renew his parole for another ninety days and during that time if the boy don't behave himself, then any time you say the word, it can be terminated.'' It also appears from the testimony of Miss Russell, that at that time appellant told her that he had had some disagreement with Robert but that it had been settled, but did not tell her the nature of the disagreement. The evidence is further that when Robert was first released from the institution on parole, Dr. Gamberg told appellant that he need not report in writing every two weeks but should meet a representative of the institution every month in Freeport. Appellant made these visits regularly and consulted with the representative of the institution. Appellant never obligated himself to advise the institution or any of its officials in the event Robert secured possession of a revolver or in the event he should have any difficulty with him about the automobile, what he did agree to was to carefully care for his son and bring him back to the institution if he found it impossible to control him. The only time he found it impossible to control him was when Robert threatened to take the keys to the car from appellant by force and immediately thereafter appellant caused him to be taken into custody and he

was released, not at the instigation of appellant, but upon the suggestion and request of the county judge.

Under the authorities, if appellant, as Robert's custodian, did something or omitted to do something, that an ordinarily careful, prudent person would have done, he was guilty of negligence and if negligent he was liable for the natural and probable consequences of his acts and for such consequences as an ordinarily prudent person might have foreseen. From all the facts and circumstances as they appear in this record, we are unable to say that appellant was bound to anticipate the unfortunate tragedy for which it is sought to make appellant respond in damages. The death of appellee's intestate cannot, in our opinion, be said to be the natural and logical consequence of appellant's conduct. Appellant was only required to use such reasonable precautions in his care of Robert as a reasonably prudent man would have adopted and as stated in the *Littlejohn* case, *supra,* the reasonably prudent man, to whose ideal of behavior we are to look as the standard of duty, will neither neglect what he can forecast as probable nor waste his anxiety on events that are barely possible. He will order his precaution by the measure of what appears likely in the known course of things. Appellant had a right to view Robert's future actions in the light of the knowledge he possessed of his mental condition and his past conduct. Those competent to judge of his mental condition advised appellant that Robert was not insane, vicious or violent and that he was a fit and proper person to be at large. It nowhere appears in the record that Robert had any homicidal tendencies. The only evidence in the record which would indicate that the opinion of the hospital physicians, to the effect that Robert was not violent, was incorrect is the occurrence when his father locked the automobile and refused to give Robert the key and Robert threatened

to take the key from him by force. From that time until the homicide Robert's conduct toward his parents and others, as disclosed by the evidence in the record, was kindly and obedient and never violent. The weight of the evidence is to the effect that appellant never permitted Robert to have or to use a revolver and that upon the only occasion when he did have one in his possession, he did what any reasonably prudent person would have done under the same circumstances. The character of restraint, which would have prevented Robert from obtaining possession of a revolver and from shooting appellee's intestate and from then committing suicide, is incompatible with him being out of an institution and an inmate of his parents' home. There is no evidence in this record concerning his conduct which would lead any reasonable mind to believe that his mental condition or his tendencies were any different on the morning of July 23, 1935, than they were on March 11, 1935 when he was released from the East Moline Hospital and paroled to appellant.

The facts in the *Littlejohn* case, *supra,* are clearly distinguishable from the facts in the instant case. It appeared in that case that Pence had hallucinations and imagined that detectives were after him to do him injury and at the time he shot and injured the plaintiff he was illegally wearing an officer's badge. In the instant case Robert had no hallucinations or delusions and in the opinion of Dr. Gamberg was not insane but suffering from a disorder of behavior characterized by stubbornness and selfishness. In the *Littlejohn* case the parolee executed an instrument in order to procure Pence's release on parole by the terms of which she assumed all responsibility for his actions, "knowing that he had not fully recovered." In the instant case appellant agreed to carefully care for Robert and to exonerate the management of the State hospital should he commit any act of violence. What the court held

in the *Littlejohn* case was that it was a question of fact for the jury to determine whether the parolee in the exercise of reasonable care could have anticipated that her ward might become dangerous at any moment and the jury having answered that question in the affirmative, a majority of the court were of the opinion that the evidence, so far as the parolee was concerned, sustained that finding. In the instant case, the weight of the evidence, in our opinion, does not sustain the allegations of the complaint, which charged appellant with negligence.

The trial court erred in not sustaining appellant's motion for a new trial and for that error the judgment will be reversed and the cause remanded.

*Reversed and remanded.*