(No. 4989—

Roy E. Clifton, Administrator of the Estate of Carol S. Clifton, Deceased, Claimant, vs. State of Illinois, Respondent.

*Opinion filed November 12, 1963.*

Sorling, Catron and Hardin, Attorneys for Claimant.

William G. Clark, Attorney General; C. Arthur Nebel, Assistant Attorney General, for Respondent.

Perlin, C. J.

Roy E. Clifton, Administrator of the Estate of Carol S. Clifton, brings this action claiming damages of $25,000.00 arising from the alleged wrongful death of Carol S. Clifton, his son.

The parties have submitted a stipulation, which includes the following facts:

"3. During the month of October, 1960, and prior thereto, respondent, through its Department of Public Welfare, owned and operated a hospital for mentally ill persons in Jacksonville, Illinois, known as the Jacksonville State Hospital.

4. Carol S. Clifton, deceased, in September of 1960, voluntarily entered and was accepted by the Jacksonville State Hospital, and was assigned a bed in a ward thereof, known as Veteran's Nine.

5. On September 30, 1960, respondent accepted to its Jacksonville State Hospital Marvin Robertson, pursuant to an order of commitment from the County Court of Macon County, Illinois.

6. On October 3, 1960, Marvin Robertson was transferred to and lodged in Veteran's Nine of Jacksonville State Hospital, where he remained until after the death of Carol S. Clifton, on or about 12:15 A.M., Monday, October 24, 1960."

The Departmental Report of the Department of Mental Health admits the following description of the occurrence, which led to the death of Carol S. Clifton:

"Marvin Robertson, a mentally ill person of a violent and dangerous character, on October 24, 1960, obtained the opportunity to, and did assault and physically strike with the metal roller of a mop bucket Carol S. Clifton, as he slept in his bed in Veteran's Nine, inflicting immediately fatal injuries to the latter."

Although the Department denies that it had knowledge of the violent and dangerous character of Robertson, claimant alleges that respondent's negligence was the cause of Carol S. Clifton's death, in that it failed to make a reasonable effort to ascertain that Marvin Robertson was a mentally ill person of a dangerous and violent character; that, notwithstanding respondent's knowledge of the dangerous and violent character of Marvin Robertson, it failed to take adequate measures to restrain and control him, so as to prevent injury to other patients of the Jacksonville State Hospital; that respondent failed to adequately supervise the ward, known as Veteran's Nine of the Hospital, where it bedded mentally ill persons, and where an assault and physical attack on one patient by another was a constant possibility and reasonably foreseeable; that respondent failed to take reasonable precautions to prevent mentally ill patients bedded in said Veteran's Nine ward from obtaining instruments capable of inflicting serious and fatal injuries.

Respondent contends that it was guilty of no negligence, and that each inmate was supervised and placed where he had a right to be; that "the State is not an insurer of the safety of the inmates", and that "to hold otherwise would require respondent to anticipate in every

instance the actions planned in the distorted minds of the inmates of its mental institutions.''

The first question to be determined by this Court is whether respondent was negligent in its duty to operate the Jacksonville State Hospital in a reasonably safe manner, so as to prevent injury to its patients.

The record reveals the following facts:

A Decatur Police Officer, Roy D. Shumard, testified that, on September 23, 1960, he found Marvin Robertson loitering in the Police Station. Robertson appeared to be concealing something in his pocket. When Shumard tried to investigate, Robertson attacked him with a kitchen knife, and attempted to stab him. Roberston also seized the revolver of a Police Sergeant, and thrust it into another policeman's abdomen.

Four days later, on September 27, 1960, a Petition for Commitment was filed by D. C. Robertson, father of Marvin Robertson, in the County Court of Macon County, requesting that the Court adjudge Marvin Robertson to be a mentally ill person, or a person in need of mental treatment, and commit him for care and treatment to a suitable public or private hospital.

Also filed in the County Court at the same time was a Physician's Certificate by Dr. V. T. Turley, which contains the following report:

"That I personally made examination of Marvin Robertson residing at Decatur, Illinois on this 26th day of September, 1960, and found him to be mentally ill. 1. Was prowling in the police station. 2. Attacked an officer with a knife. Required three officers to subdue him. 3. Delusions."

The Report of Commission filed in the County Court on September 29, 1960, and signed by Dr. Mary Zeldes and Dr. William Mundt, states that Marvin Robertson was ''suffering from abnormal behavior, such as burning his clothes, going off by himself, and wanting to be alone. Schizoid type of behavior.''

The Order of Commitment was entered September 29, 1960 in the County Court.

The Hospital Record Progress Notes state that Marvin Robertson was admitted to the Jacksonville State Hospital on September 30, 1960. The first notation states that the patient was brought by a Deputy Sheriff from the Macon County Jail, and further states ''Read the Report of Commission.'' It was signed by a P. Reynolds, who did not testify in the instant case.

Dr. Pedro Lense testified that, at the time of the occurrence in question, he was a ward physician at Jacksonville with the responsibility of making the initial admission note, and the physical and mental examination of the patient. He prepared the Initial Examination for Marvin Robertson, which consisted of a ten or fifteen minute interview, and physical examination, dated September 30, 1960, as follows:

"Brief Statement of Mental Condition—

Patient is alert, quiet and cooperative. Does not talk freely, and seems hostile. His speech is hesitant and very rambling. States that police brought him here. He does not know why, he says, but tells he was in jail, because he was carrying a 'deadly weapon' (a kitchen knife). Explains he went to see his brother, he thought he was in the police station, and entered there the wrong way (back door). The police searched him, found the knife, put him in jail, and beat him . . ."

Dr. Lense made no effort to determine what actually did occur at the Decatur Police Station. Since the patient was a veteran, he was immediately transferred to the Veterans' ward. ''This was not my duty to keep investigating about . . . each patient.''

Dr. Lense testified that he did not remember whether the documents entitled ''Report of Commission of the Macon County Court'', ''Petition for Commitment'', and ''Warrant of Commitment'' were available at the time he examined Robertson. However, his testimony reveals that

Robertson's record would have made little difference in his disposal of the case. It was, as follows:

"Q. Would I be correct in saying that, regardless of what information you had about a patient, whether he had a history of prior violent attacks on third parties, as long as he wasn't violent at the time you examined him, he was automatically transferred to Veteran's Nine?

A. Yes."

Robertson remained in the admitting ward from September 30 to October 30, 1960. Dr. Lense further testified that he did not know what security measures were taken in Veteran's Nine, but that it was supposed to be a closed ward, where the patients were kept under surveillance and under observation until the final mental work-up is done. He was not aware that Veteran's Nine had three separate dormitories or a cafeteria, and did not know the number of patients or the number of attendants in the ward.

Dr. Surab Gam, the ward physician, testified that he handled the daily problems in six wards, including Veteran's Nine. The diagnosis of a patient took four to six weeks, and during a patient's stay in Veteran's Nine the diagnosis was not known. Dr. Gam stated that a normal procedure would be to utilize hospital records in examining and treating the patient, although he could not recall whether he used Marvin Robertson's records. He stated that, if the folders did not have full summaries, he may not have read his record, although he agreed that good hospital procedure would require the records to be kept up to date.

Lloyd Meyer, a psychiatric aide assigned to Veteran's Nine in October, 1960, testified that Veteran's Nine had about ten rooms, and only one psychiatric aide was assigned per shift. There were about twenty-two patients in Veteran's Nine at the time of the homicide. He testified that one day Clifton (the deceased) came up to him, took him aside quietly, and reported that

Robertson had something hidden in his pocket. He had Robertson empty his pockets, and took away a bed caster tied with a handkerchief. When Meyer asked why he had it, Robertson said he didn't know. Meyer reported the incident to Dr. Gam, who instructed him to give Robertson a tranquilizer, and said he would see him later. Meyer then noted this in the ward incident book, which is used by the ward attendants for their daily record, and underlined it in red, because he "wanted it to stand out." Meyer testified that Veteran's Eight, another diagnostic facility, was available for veterans, if they were combative, and differed from Veteran's Nine in that two attendants were always on duty.

An entry in the "Progress Notes" of the hospital record, dated October 9, 1960, and initialed by Dr. Gam, states that "Patient removed rollers from bed, tied them in a handkerchief, and hid them in his pocket. When asked why, he stated that he wanted to practice spinning." This was followed by a notation that Compazine had been prescribed. Dr. Gam testified that he had prescribed tranquilizers at that time, but the doses were low, and not for the purpose of keeping the patient harmless, since five times the amount prescribed for Robertson was normally given for such purposes.

Dr. Gam stated he saw Robertson about fifteen or twenty times, and he was not combative at these times. He said that, if a patient showed signs of violence outside, he would probably be given special consideration, and would not ordinarily be placed in Veteran's Nine. Those with homicidal tendencies might be placed in East Hydro, the top security ward, or Veteran's Eight, which has two attendants twenty-four hours a day, with closer supervision and more restricted freedom than Veteran's Nine. Dr. Gam testified, upon being shown the Physi-

cian's Certificate from the Macon County Court record, that he had never seen it. Dr. Gam further testified that Marvin Robertson was not diagnosed until after the homicide on October 24, 1960.

Witness, Lloyd Meyer, who worked the shift prior to the homicide on October 24, 1960, said that he did not have occasion to open the cleaning closet wherein the mop equipment was stored, but that the shift preceding his probably had access to it. He did check to see if the closet door was locked. He did not know whether the rollers were missing off the mop equipment.

The attendant in charge of the earlier shift was not called to testify, and respondent states in its Departmental Report that investigation did not reveal the way in which Robertson obtained the instrument used in his attack.

Meyer also testified that the mop buckets were subsequently changed from the roller type to the squeeze type, and that, in addition to two attendants now on duty in the Veteran's Nine Ward, there are more frequent checks of patients and their possessions. He said that the purpose of locking the door in the cleaning closet was to prevent patients from obtaining instruments, which they might use to injure themselves and other patients.

Rubin Sanders, the attendant in charge of the ward during the time of the homicide, testified that he came on duty that night about 11:00. He checked the ward to see if all the patients were in bed, then proceeded to make out his nightly ward reports, which generally take him an hour and a half to complete. He was the only attendant on duty for the three dormitories, and from his station he could see patients going in and out, but could not see into the wards. He did have a patient in the ward, who was designated homicidal and suicidal. This patient was kept in a dormitory by himself at the door where he could

be seen from the nurse's station. Sanders testified that Robertson got up and went into the toilet about 12:00 or 12:15, then returned to the dormitory. Clifton and Robertson were in the middle dormitory with a total of fourteen patients. After Robertson went back to the dormitory, Sanders heard a noise like heavy breathing. A patient called to him to come up there at once. When Sanders got there, he found Clifton injured, and "breathing slower", a mop roller was lying between two beds, and Robertson was standing by himself between two other beds. Sanders further testified that after the homicide the supervisory nurse brought Robertson's records down, and said he was homicidal and suicidal, "but we didn't know that."

Leslie Robinson, Chief Security Officer of the hospital, testified that in investigating the homicide he opened the utility room where the buckets were kept, and discovered that the roller had been removed from one of the buckets, but no one knew when the roller was removed.

The diagnosis of Robertson found in the hospital record is dated October 24, 1960, and includes the following:

"A 21 year old colored male, single, eighth grade education. Has recently been taking training in shoe repair. Ever since he was discharged from the Air Force in 1958, the parents state he has been seclusive, withdrawn and acting peculiarly. He burned his clothing, slept on the floor, preferred to be in the basement at night, and would have a rug over his head. It is possible he has been hallucinating. He lost about fifteen pounds in the past six months. The police picked him up for carrying a concealed weapon (knife), and he was committed to this hospital. On admission, he was quiet and cooperative, would not talk freely; his speech was hesitant and very rambling. He could not explain why he carried a kitchen knife. He admitted hearing voices while in the Air Force. On the ward, he would smile frequently and inappropriately. About ten days earlier, it was reported he had a bed roller wrapped in a handkerchief in his pocket. On the night of October 24, 1960, he struck another patient, who was asleep, with an iron roller from a mop bucket, killing the other patient. At first, he denied having anything to do with it, but, on further investigation, he

finally admitted he had struck the patient once, would not give any other explanation. . . ."

The diagnosis further stated that, "in view of the patient's homicidal tendency, it is recommended that he be transferred to the Illinois Security Hospital" with close supervision as a special precaution.

The question of the degree of care owed by the State in operating a mental institution was determined by this Court in *Callbeck* vs. *State of Illinois*, 22 C.C.R. 722 at 728:

"The State, in operating a mental institution and caring for mentally ill persons, is, of course, not an insurer of the safety of its employees. The State is, however, under the same duty as a private person or institution having custody of insane persons. It is required to exercise reasonable care in restraining and controlling dangerous insane persons committed to its custody, so that they will not have the opportunity to inflict a foreseeable injury upon others. *Malloy* vs. *State of Illinois*, 18 C.C.R. 137; Fisher vs. *Mutimer*, 293 Ill. App. 201, 220; *Restatement of the Law of Torts*, Sec. 319; *Smart* vs. *U. S.*, 11 F. Supp. 907, 909; *Rossing* vs. *State of New York*, 47 N. Y. Supp. 2d 262."

It is the opinion of this Court that respondent was negligent in the following particulars:

1. Although respondent claims to have had no knowledge of the dangerous and violent character of Marvin Robertson, it is difficult to accept the premise that reasonable precautions to determine the nature of his disturbance upon his commission to the institution would not include an inquiry as to the incidents, which precipitated such commission. Although informed by the patient himself that an incident involving a deadly weapon was at least partially responsible for his commission, no effort was apparently made to read or to obtain the proper public records, which would have detailed the incident, nor was any investigation of such incident even considered. Mere reading of the original "Physician's Certificate", which was or should have been readily available, would have revealed that Marvin Robertson had dangerous propensities.

2. Respondent acknowledges that a sudden, unpredictable assault and physical attack on one patient by another is a constant possibility and calculated risk in any ward of any mental hospital. Assuming this, when the nature of a person's illness has never been determined, as in this instance, it is unreasonable to place these undiagnosed patients in a virtually unsupervised ward. The mere size and nature of Veteran's Nine would seem to call for more than one attendant, and, subsequent to the homicide, two attendants were indeed placed on duty. If Marvin Robertson had been supervised, as his case warranted, he would have received the special attention given the one homicidal-suicidal patient in Veteran's Nine, or he would have been placed in Veteran's Eight, which took greater security precautions.

3. The incident of the bed caster two weeks before the homicide was apparently of sufficient significance to be placed in the "Incident Book", and underlined in red, as well as to be used in the final diagnosis, and should have alerted the proper personnel to exercise more precaution over Robertson.

4. In the Departmental Report, respondent states that the investigation did not reveal the way in which the assailant obtained the instrument used in his attack, but the rules governing the storing of equipment are intended to make it impossible for disturbed patients to obtain material, which could be used as weapons. It appears that respondent failed in this instance adequately to safeguard such material.

The second question presented to this Court is the extent of damage sustained by claimant. Claimant testified that at the time of the homicide his son was 32, and claimant was 68. The deceased first experienced mental illness in 1959. He was allegedly never irrational, but

had attacks of depression, and found it difficult to perform his work. In 1959, Carol Clifton voluntarily entered the Jacksonville State Hospital. He was discharged after a period of 58 days. He earned about $50.00 per month doing odd jobs in the neighborhood, and allegedly contributed this money to the household. He chauffered his father in his father's car, took care of appliances, and assisted claimant in the maintenance of their home and garden, and raised strawberries, raspberries, and rabbits for home consumption and for market.

An evidence deposition by Dr. F. G. Norbury, physician for the deceased, was submitted by claimant, in which the doctor stated that Carol Clifton suffered from schizophrenic reaction or dementia praecox, characterized by anxiety and depression. It was difficult for the patient to engage in full time productive employment, but he did have a history of engaging in odd jobs for hire, such as mowing lawns and cutting wood. His likely course of illness was stationary with no marked improvement or deterioration. He should not have required continued hospitalization, and could allegedly have assisted his father, and could have performed household jobs.

It is noted, however, that, in completing forms at the time Carol Clifton entered the hospital, claimant stated ''I support the patient myself.''

It is the opinion of this Court that claimant be awarded the sum of $3,500.00.