(No. 4612-

MARTHA CALLBECK, Claimant, vs. STATE OF ILLINOIS, Respondent.

*Opinion filed July 24, 1958.*

G. WALLACE ROTH, Attorney for Claimant.

LATHAM CASTLE, Attorney General; MARION G. TIERNAN, Assistant Attorney General, for Respondent.

WHAM, J.

This is an action brought by claimant, Martha Callbeck, against respondent, the State of Illinois, to recover $7,500.00 in damages for personal injuries, which she sustained in the early morning hours of October 10, 1953, when she was awakened in her bedroom, attacked and assaulted by an insane patient at the Chicago State Hospital where she was employed in the capacity of housekeeper by the Illinois State School of Psychiatric Nursing, a branch of the Chicago State Hospital.

She charges in her complaint that this institution was operated by respondent for the purpose of caring for and treating mentally ill persons, and that, through its agents and servants, respondent negligently and carelessly permitted one Charles Bigalke, a dangerous mentally ill patient, to roam at large, gain entrance to the nurses dormitory building, and assault, beat and rape claimant, severely injuring her person, and causing her to suffer pain, humiliation, fear and mental anguish, and requiring the expenditure of large sums of money for medical attention in treating her injuries. She further alleged that she was in the exercise of ordinary and reasonable care and caution for her own safety, and was free from any contributory negligence or provocative action.

Respondent proceeded to trial under a general denial of the facts set forth in the complaint pursuant to Rule 11 of this Court. In its brief and argument, respondent stated that claimant had no claim under the Workmen's Compensation Act, and acknowledged that the claim was properly filed in this Court under the Court of Claims Act.

The evidence for the most part is not conflicting. Claimant, Martha Callbeck, at the time of the assault was a 65 year old widow, who had been employed since Sep-

tember of 1941 by respondent as housekeeper for the student nurses dormitory at the Illinois State School of Psychiatric Nursing, located on the grounds of the Chicago State Hospital. Her hours of duty were from 8:00 A. M. to 4:00 P. M., and her duties consisted of supervising the cleaning of the dormitory, procuring the necessary supplies, and seeing to it that the necessary repairs were made.

During the thirteen years she was employed, she resided in one of the private rooms in the dormitory. Her room was on the first floor of the three story dormitory building, being the last room on the west in the south wing. It had two windows, one on the west and one on the south.

There were three entrances to the dormitory building. The main entrance was never locked, but the south entrance was latched at night.

On the night of October 10, 1953, she went to bed at approximately 10:00 P. M., leaving her bedroom door open. She used a screen in her doorway wedged between two closet door knobs to afford her privacy. This had been her regular practice, and she had never kept her bedroom door locked.

After falling asleep, her next recollection was suddenly awakening and feeling a hand on her neck or chest. Realizing there was another person in the room with her, she sat up and saw a man, whom she later identified as Charles Bigalke. She commanded him to leave. He struck and choked her into unconsciousness. When she regained consciousness she was on the floor, and he was standing between her and the door. The window was her only exit. She jumped out of the window, lost consciousness again, and then crawled, walked, and made her way to the nearby

cottage ward No. 23, where she was administered first aid by Bertha Clark, a psychiatric aid, who had been called immediately. This was at approximately 4:30 A. M.

Mrs. Callbeck was then clad only in a summer night-gown, barefooted, bloody, dirty, and in a state of severe shock. There was blood in her eyes, nose, mouth, ears, and on her neck and chest. Her nose was broken, her face bruised, her eye was black and blue, her jaw bruised and swollen, and she was suffering pain.

Bertha Clark washed the blood from her face, placed her on a cot, wrapped her in a blanket, and some forty minutes later she was taken to the hospital on a stretcher. During all of the time Mrs. Callbeck was attended by Bertha Clark, she was in shock and moaning. At the hospital she was first observed by Dr. Steponas Gestautas, emergency medical officer on night duty, to whom she related the details of the assault, and told him that she had been choked into unconsciousness, and did not know whether or not she had been raped. He examined her visually, and found no evidence indicating rape.

The doctor testified only from his notes, since it was necessary to refresh his recollection. He did not know whether or not her nose was broken, but stated that she was shaky, pale, shocked, excited, and that he noticed several bruises on her face, nose, neck, hands, knees and feet. He ordered her to bed, and administered sedatives.

Dr. Leo Goldman, who became her treating physician, was called to see her at the Infirmary of the Chicago State Hospital on October 10, 1953. He testified that a physical examination revealed multiple bruises and swelling about the nose, extreme bruises on her breast, both thighs, and pain and tenderness in the back and wrist.

He found friction like burn marks on her neck. She complained to him of headaches, and was extremely nervous.

He hospitalized her at the Mt. Sinai Hospital, where an X-Ray examination revealed a fracture of the nasal bone. Her nose was tender and swollen. He then made a vaginal examination upon her complaint that she had been raped. This examination was negative. He splinted her nose, treated her with analgesic, administered sedatives, and ordered hot packs applied to the bruised area. She remained in the hospital one week, and Dr. Goldman saw her as a patient at his office on approximately nine occasions thereafter.

On cross-examination, he stated that there was no direct evidence of rape, that the black and blue marks and bruises cleared up, and the pain subsided.

He last saw her on March 5, 1954, at which time she complained of recurrent headaches, frequent nausea and nervousness. During the course of his treatment, she complained of tenderness in the lower back for which he prescribed a corset. His tentative diagnosis at that time was a post-concussion syndrome. His statement for services rendered was $300.00, which he stated was a reasonable and customary charge for such services as he had performed. Her hospital bill was $125.00.

Dr. Isadore Spinka, a psychiatric consultant at the Chicago State Hospital, saw her in his capacity as Clinical Director the day following the occurrence. At that time he found her to be rational, but emotionally agitated and anxious. He noted bruises and swelling about the face. She told him she was not sure, but she thought she had been raped.

Martha Callbeck testified regarding her physical injuries, and stated over objection of respondent, and in

response to leading questioning by her counsel, that Bigalke had intercourse with her. This answer was stricken by the Commissioner hearing the case on motion by the Attorney General, and properly so. She further stated that she had lost weight, and had become very nervous. However, she returned to work two weeks after the occurrence, and continued to work up to the date of the hearing, which was held on the 24th day of September, 1956. She resigned her position effective September 30, 1956. Subsequent to the occurrence, she no longer lived on the grounds. She claims that this was caused by fear, which the assault caused her to have, and necessitated her incurring extra living expenses in the amount of approximately $1,900.00. We believe, however, this element of damage is too remote and speculative. We will not consider it.

With respect to the medical testimony regarding her physical injuries, we note the last doctor to examine and treat her was Dr. Goldman in March of 1954, some two and one-half years prior to the hearing date. His tentative diagnosis of a post-concussion syndrome was not confirmed by any other witness, and he stated, "I think it would have taken a further evaluation, another six months, to be absolutely positive of this". Claimant made no effort to introduce further testimony regarding this element of the case, nor does it appear that she sought further treatment, and we presume, therefore, that there were no further symptoms of such condition.

From the evidence in this case, there has been no permanent injury established, nor can we say that the evidence establishes that claimant was raped.

Irrespective of this, however, she was brutally assaulted, did sustain painful injuries, including a broken

nose, incurred medical and hospital expenses, and was subjected to a terrifying experience, for which compensatory but not punitive damages should be awarded in the event we find that she is entitled, under the law, to recover.

The state, in operating a mental institution and caring for mentally ill persons, is, of course, not an insurer of the safety of its employees. The state is, however, under the same duty as a private person or institution having custody of insane persons. It is required to exercise reasonable care in restraining and controlling dangerous insane persons committed to its custody, so that they will not have the opportunity to inflict a foreseeable injury upon others. *Malloy* vs. *State,* 18 C.C.R. 137; *Fisher* vs. *Mutimer,* 293 Ill. App. 201, 220; *Restatement of the Law of Torts,* Sec. 319; *Smart* vs. *U. S.,* 111 F. Supp. 907, 909; *Rossing* vs. *State,* 47 N.Y. Supp. (2d) 262.

As was stated by the New York Court in the case of *Rossing* vs. *State* (supra), "The degree of care, which the law exacts from those in charge of institutions for the insane toward its patients, is such reasonable care and attention for their safety and the safety of others as their mental and physical condition, if known, may require, and should be in proportion to the physical or mental ailments of such patient."

The facts, as we find them to be from the evidence in this case, establish negligence on the part of the state, through its employees charged with the care of the assailant, Charles Bigalke, in allowing him to be at large in the early morning hours.

This was a dangerous man, and the records of the hospital with reference to his previous history leave no

room for doubt that he should have been kept under close surveillance, especially so in the hours of darkness when women were sleeping within the confines of a building easily accessible to him when roaming at large.

He was, according to a report from Dr. D. D. Campbell, Acting Superintendent of the Hospital, which report was introduced by claimant as exhibit No. 5D, a 28 year old man with a diagnosis of a chronic brain syndrome, post-encephalitis with psychotic reaction. He was admitted to the Dixon State Hospital in July of 1935, remaining there until July of 1952, at which time he was committed to the Chicago State Hospital. During his stay at the Dixon State Hospital, he was a chronic behavior problem, and on many occasions had assaulted and attacked other patients and employees. He kicked them, and employed the use of his fists, shovels, razor blades, pieces of pipe and other objects in the attacks. His past record indicated perverted sexual acts, homosexual attacks on boys, and the commission of the act of sodomy. At the Chicago State Hospital he had made sexual assaults upon a female patient less than one month prior to the assault upon claimant. After he assaulted claimant, Dr. Campbell urgently requested in his report to the Department of Public Welfare, dated October 14, 1953, that Bigalke be transferred to the Illinois Security Hospital as soon as possible.

Another exhibit introduced by claimant, No. 5E, reflects that as early as July of 1952 Bigalke was classified by Dr. Klapman, a state doctor, as "homocidal—dangerous".

In view of this history, it became the duty of the authorities to require their subordinates, and it became the duty of the employees in charge, to exercise the

utmost vigilance in controlling the activities of this man. It also became the duty of the state hospital authorities to instruct the attendants concerning the extent of control required to be exercised for such a dangerous patient.

In our judgment, this man should not have been permitted to be at large within the grounds, at least in the hours of darkness, without proper surveillance. All employees should have been fully apprised of this fact.

According to the testimony of Dr. Spinka, Clinical Director at the Hospital, Bigalke was kept in locked ward CW-13, in which a few of the inmates, whose conduct merited it, had been issued privilege cards, which they carried upon their person, and of which a record was kept in each ward. These privilege cards designated those who could be allowed to go about the grounds without an accompanying attendant. He stated, however, that it was not the routine practice for even a privileged patient to leave the ward at 4:00 A. M. unattended. In some instances, it was customary to allow those patients, who worked early in the kitchen, to proceed there alone. This witness did not testify as to whether or not Bigalke had a privilege card.

On the occasion in question, Anthony Staszak, the attendant on duty at the time, allowed Bigalke to go alone from the ward to the hospital office for the purpose of carrying a report, and from there to the dining room to await the other inmates.

When he, Staszak, next saw him at approximately twenty minutes to six, Bigalke was in the dining room waiting for the other inmates. In the interim, however, Bigalke had taken the time, and seized the opportunity to perpetrate the brutal assault upon claimant.

The attendant testified that he had been employed at the hospital for 19 years, could read and write, had re-

ceived a five year grammar school education, and had previously attended the ward on three or four occasions. His only explanation for allowing Bigalke to go from the ward alone was that he had been told by some other employees and inmates that Bigalke was a "pretty good trustee", and that he is "one you can trust". He further stated that he had not been given a history on the man, and did not know his history until after the assault on claimant. He testified that Bigalke had a pink card stating "Ground Parole", which he saw before letting him out.

An explanation of this mistake appears from claimant's exhibit No. 5F, a letter from Dr. D. D. Campbell, Superintendent, to the Department of Public Welfare, dated October 14, 1953, pertaining to the incident. It reads in part as follows: "The patient, Charles Bigalke, was housed in ward CW-13. On October 10, 1953, at about 4:30 A. M., the night attendant in said ward, Mr. Anthony Staszak, allowed the patient to leave the ward to take the ward reports to the supervisor's office. Apparently this attendant, who was working as a relief on the ward, was not well acquainted with the patients, and thought that the patient, Charles Bigalke, had a privilege card. Accordingly, he allowed him to leave the ward unescorted. From our investigation we got the impression that the attendant had mistakenly identified this patient with another patient, who did have a privilege card."

It is, therefore, apparent that either the attendant was negligent in not taking proper precaution to determine the status of Bigalke, or respondent's supervisory personnel were negligent in failing to properly instruct the attendant as to Bigalke's status. In either event, Bigalke was allowed to go at large through respondent's

negligence, and, as a proximate result thereof, committed the injurious assault upon claimant.

Respondent contends that claimant, by failing to lock her bedroom door, was guilty of contributory negligence, which proximately contributed to cause her injuries, and consequently cannot recover. We do not agree with this contention.

She had lived upon the premises for thirteen years, during which time she had not locked her door, and no harm had befallen her. There were no rules of the institution requiring that she do so. Respondent's witness, Sara Abrahms, director of the Nurses Psychiatric Training School, who lived upon the premises, testified that, although she had a key to her own bedroom, she only occasionally locked her door at night. She further stated that it was optional whether or not the occupants of the building locked their doors.

The evidence reflects no like incidents, which would serve as notice to claimant of a danger in failing to lock her door. Mrs. Callbeck testified that she had never heard of such a happening prior to the occurrence.

Claimant's witness, Anna Gramann, employed as house mother of the nurses' quarters in which claimant lived, testified that none of the nurses' bedrooms were locked, since, in checking them in the course of her duties, she was able to walk into the rooms.

Two witnesses for respondent, Anna Vaughn and Mary C. Martin, state employees, testified that they locked their doors at night.

The test of due care and caution, which claimant is required to establish as an element of her case, is simply stated. The only care and caution required of her was such conduct, care and caution for her own safety as a rea-

sonably prudent and cautious person would have exercised under the same or like conditions and circumstances, which surrounded her before and at the time of the alleged occurrence. She was not required to exercise extraordinary care or diligence.

In view of the facts, as we understand them to be, claimant had no reason to believe that she would be attacked by a wandering insane man in the early hours of the morning. She had no reason to believe that such a man would be allowed to roam the grounds unattended and alone. She was not, in our judgment, guilty of contributory negligence. The facts establish that she was exercising due care and caution for her own safety, and did nothing to incur the injury or incite the assault.

Consequently, we hold that she is entitled under the law to recover damages in this action. We believe that, in view of the injuries heretofore narrated, $3,000.00 is a fair and just award.

It is, therefore, our order that the claim should be, and is hereby allowed in the sum of $3,000.00.