(No. 75-CC-0113–)

NATIONAL BANK OF BLOOMINGTON, Administrator of the Estate of Rae Ann Schneider, Deceased, and CLEMENS SCHNEIDER, Claimants, *v*. THE STATE OF ILLINOIS, Respondent.

*Modified opinion on denial of motion for reconsideration filed February 24, 1982.*

JEROME MIRZA & ASSOCIATES, LTD., for Claimants.

TYRONE C. FAHNER, Attorney General (ANDREW R. JARETT, Assistant Attorney General, of counsel), for Respondent.

HOLDERMAN, J.

The issue in this case is whether or not Robert Drucker, an employee of the State of Illinois who was the parole officer assigned to supervise a parolee, one Jesse Sumner, was negligent in his duties, thereby leaving Mr. Sumner free to commit three murders rather than being remanded to a State penitentiary.

Jesse Sumner had been convicted of two bank robberies and one murder when he was paroled from the Department of Corrections in December of 1972. He was placed under the supervision of parole officer Robert Drucker, an employee of the State of Illinois. The parole officer, also an ex-convict, had been convicted on a charge of statutory rape.

The record of the parolee from the time of his parole until he was arrested for the murder of Rae Ann Schneider is as follows. The parolee threatened to kill a certain Mrs. Clark if she testified against him on a

criminal damage to property charge. The parole officer was aware of the threat against Mrs. Clark. He talked to her and told her the parolee was a dangerous man and indicated to her she might place herself in some physical danger if she testified against him. In any event, and whether this was a cause or not the record does not show, Mrs. Clark did not show up at the time of the hearing on the charge of criminal damage to property. The date of the hearing was December 22, 1972, the day Rae Ann Schneider was murdered.

A circuit judge of the area in which the parole officer and parolee lived informed the parole officer that the parolee had made various threats to kill people. The record shows that the parole officer also received an anonymous letter stating that the parolee was threatening the lives of various people. Shortly thereafter, he was charged with aggravated incest and the record indicates he had been in trouble with a Federal parole agent.

The record, which is largely the testimony of the parole officer, is uncontradicted in any manner, shape or form. The record shows the parolee had come back to Danville, which was out of the county in which he was paroled, and threatened witnesses who had testified against him at the time of one of his previous convictions. Shortly before this time, the parolee had been ordered to stay out of Danville except during daylight hours.

The evidence indicates that the parolee had slit the throat of his accomplice in a bank robbery for which he was originally convicted of murder. This conviction was later changed to one of manslaughter by order of the court.

The record shows the parolee threatened his first

wife and that he was arrested for assaulting his second wife. He had also been charged with the offense of aggravated incest. The parole officer testified he did not know of that charge.

It seems to the Court that one of the obligations of a parole officer is to contact the various law enforcement agencies in his area to see whether the parolee has violated the terms of his parole.

The parole officer testified that when he interviewed the parolee's wife, she was very nervous and agitated but she told him everything was all right at their home. Her attitude and reaction should have told him things were not normal.

The original conditions of Mr. Sumner's parole were that he was to remain in the county to which he was paroled but the record indicates the parole officer had given him parole slips allowing him to travel to places he desired. Another condition of his parole was that he was to refrain from associating with other ex-convicts and the parole officer testified that he encouraged the parolee to associate with one other ex-convict so he was aware he was violating the conditions of his parole.

Beginning with the bank robbery, which resulted in the charge of murder against the parolee, the record shows one continuous sequence of events that should have indicated to the parole officer that his parole should be revoked. The parole officer testified that he was afraid of the parolee.

It is interesting to note that most of the above facts were obtained from the testimony of the parole officer so there can be no question of the knowledge on the part of the agent of Respondent. There is also no question

that the parole officer at any time attempted to revoke the parole of the parolee so that he could not continue his acts of violence on people or property.

The record shows that the parolee not only killed Rae Ann Schneider but also killed two other young women. The record does not disclose when the two other murders took place.

It would be difficult to find a case that could show more proof that the State, through its agent, had knowledge of the habits of the parolee and that these habits were dangerous to society at large. Respondent attempts to defend itself on the theory of proximate cause. The Court is of the opinion if there ever was a case of proximate cause, this would rank No. 1.

It is interesting to note that nearly all of the acts cited above took place between the time of parolee's parole in January 1972 and December 22, 1972, less than one year. During this period of time, despite the knowledge of the incidents above referred to, nothing was done by the State to protect society as a whole.

This Court, in the case of *Maloney v. State of Illinois*, 22 Ill. Ct. Cl. 567, laid down the following rule:

"The agents of the State are required to use ordinary care to protect persons and their property from being damaged by those placed under their charge."

In the same case, the Court stated:

"Evidence showed that the State's agents had sufficient warning of patient's condition, which would have justified and warranted them to keep him under closer surveillance . . ."

In the case of *Callbeck v. State of Illinois*, 22 Ill. Ct. Cl. 722, the Court laid down the following rule:

"State is required to exercise reasonable care in restraining and controlling dangerous insane persons committed to its custody, so that they will not have the opportunity to inflict a foreseeable injury upon others."

The Court stated, in the case of *Gillespie v. State of Illinois*, 25 Ill. Ct. Cl. 309:

"Where evidence showed Respondent was negligent, such negligence was directly responsible for the injury, and Claimant was free from contributory negligence, an award will be made."

The Court is of the opinion that the extraordinary facts herein put this case in an exceptional category and are far removed from the ordinary case of proximate cause.

The record discloses that a man who had already committed murder and had been placed on probation for a period of approximately one year continued to endanger the lives and property of others and yet the State, in whose custody the parolee remained, did nothing to correct, punish, restrain or prohibit any future acts of violence. The record shows the State was negligent in not fulfilling its primary duty to the citizens of the State to protect their very lives and property.

This case is not intended to be a landmark for future cases involving proximate cause unless the records in such cases are as clear and demonstrative of continuous acts of an individual to endanger his fellow citizens and their property as this one.

The Court cannot, in good conscience, find that the eventual event of murder was not readily foreseeable.

In its motion to reconsider, Respondent, for the first time in over six years of hearings, raises the question of whether or not the Court of Claims has jurisdiction in this matter. It cites at greath length the case of *People v. Maryland Casualty Co.*, which was heard in the District Court of the U.S. Northern District, Eastern Division. In that case, suit was brought against the Maryland Casualty Company and State officers personally when the water

supply system of the Manteno State Hospital became dangerously contaminated and caused an outbreak of typhoid fever, resulting in the deaths of four individuals and injuring several others. The complaint alleged it was the duty of the various State departments to provide safe drinking water and that they failed in said duty. This suit was not in the Illinois Court of Claims. Respondent takes the position that this case governs the present case and that there was not any liability on the part of Respondent.

The Court calls attention to the following Illinois statutes:

"Except as provided in 'An Act to create the Court of Claims, to prescribe its powers and duties, and to repeal an act herein named,' filed July 17, 1945, as amended, the State of Illinois shall not be made a defendant or party in any court." Section 1 of "An act in relation to immunity for the State of Illinois." Ill. Rev. Stat., ch. 127, par. 801, effective January 1, 1972.

"The Court shall have exclusive jurisdiction to hear and determine the following matters:

. . .

(d) All claims against the State for damages in cases sounding in tort, if a like cause of action would lie against a private person or corporation in a civil suit . . ." Section 8 of The Court of Claims Act. Ill. Rev. Stat., ch. 37, par. 439.8.

The case of *People v. Maryland Casualty Co.*, 132 Fed. 2d 850, is not controlling in view of the statutes cited. It is certainly true that a private corporation would be liable for the conduct of the parole agent, if he were an employee of a private corporation. Being employed by the State, his conduct is chargeable to the State by virtue of express authority of the Court of Claims Act.

The record shows that the parolee, in one short year, by his many acts of parole violations and total disregard for human life created a pattern of foreseeability of the events that would happen. The records indicate the unfortunate victim, Rae Ann Schneider, was a young

woman, steadily employed, of good habits, and in comparatively good health.

The Court notes with interest the statement of Respondent that only two of 22 parolees in the parole officer's care were deprived of their parole. This is indeed an endorsement of the Court's decision in this case, that is to say, that this is an extraordinary case. It offers the finest possible rebuttal to Respondent's statement that this case would be a key to open up the treasury of the State of Illinois. If the parole system is working as it is supposed to, then a death like the one in this case should be either eliminated entirely or become a rarity. Illinois citizens can then lead their daily lives secure in the knowledge that the sovereign power is doing what it is supposed to do in assuring the safety of its citizens.

Respondent also sets forth that the Court's decision is too harsh in that it might cause the incarceration of parolees, to their detriment. The Court is of the firm opinion that if it becomes a choice between the welfare of the average citizen of the State and the possible reincarceration of the violators of the law of the State, reincarceration would be a cheap price to pay for the citizens' safety.

We are aware of the general principle that where the State defines by statute the powers and duties of officers of its departments, it is not creating duties the officers owe to individuals who may constitute the general public; it is "merely outlining the State's assumed public duty," and in the performance of this "public duty" the officers are not liable to an individual for negligence. *People v. Maryland Casualty Co.*, 132 Fed. 2d 850; *Porter v. City of Urbana* (1980), 88 Ill. App. 3d 443.

The rule doesn't apply when the official (as a police officer) has assumed a special relationship to a person that elevates his status to something more than just being a member of the general public. *People v. City of Urbana, supra.*

Our question in the instant case is whether there is anything in the statutes that circumvents this general principle. We hold that there is. At the outset, we are mindful that the State is generally immune from being sued in any event but an exception is provided for those claims where jurisdiction has been granted to hear claims under the provisions of the Court of Claims Act. (Ill. Rev. Stat., ch. 127, par. 801.) By virtue of this act, the Court has been granted authority to hear claims in certain matters where it is specifically granted. For example, this Court can hear claims under the Crime Victims Compensation Act, and claims caused by escaped inmates of State institutions. In these instances, the question of "public" duty of the officials is not an appropriate defense in an action before the Court of Claims against the State.

The legislature has seen fit also to grant the Court authority to hear claims sounding in tort if a like cause of action would be against a private person or corporation in a civil suit. (Section 8(d) of the Court of Claims Act. Ill. Rev. Stat., ch. 37, par. 439.8(d).) Our holding in the case at bar is founded upon this statutory provision which we interpret to mean that the distinction between "public duty" and "private duty" is not appropriate in a case before the Court of Claims sounding in tort based on a public official's conduct.

Surely a private corporation in conducting its affairs has not been granted by the statute the duty to carry out

its safeguards only as a duty owed to the public generally. By the provision of the Court of Claims Act cited above, the legislature has classified the State as a private corporation in claims sounding in tort. Such being the case, we are constrained to hold the difference between public duty and private duty is not appropriate in tort claims brought before the Court of Claims and the cited cases are not controlling.

In our judgment, a private corporation would be liable in the instant case if the parole agent were acting as an employee of a private corporation. Therefore, the State likewise is liable, but not to exceed the limited amount provided in the Court of Claims Act. The distinction between the Court of Claims and a court of general jurisdiction is illustrated by this treatment of tort claims.

To further substantiate this position, it is to be noted that the Court of Claims Act provides specifically that the "defense that a State is not liable for negligence of its employees is not applicable to determining claims brought before the Court of Claims."

Respondent's motion to reconsider is denied, and the Court reaffirms its award in favor of Claimant in the amount of fifty thousand ($50,000.00) dollars, plus an additional $1,508.80 for reimbursement of funeral expenses, for a total award of fifty-one thousand five hundred and eight dollars and eighty cents ($51,508.80).